**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 26, 2018**

# In the Court of Appeals of Georgia

A18A1173. NATIONAL UNION FIRE INSURANCE COMPANY    DO-041
    OF PITTSBURGH, PA et al. v. SCAPA DRYER FABRICS,
    INC.

A18A1174. SCAPA DRYER FABRICS, INC. v. NATIONAL    DO-042
    UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
    PA et al.

DOYLE, Presiding Judge.

Scapa Dryer Fabrics, Inc. purchased annual liability insurance policies from National Union Fire Insurance Company of Pittsburgh, PA and New Hampshire Insurance Company for coverage for claims of injurious exposure to Scapa's asbestos-containing dryer felts. Scapa sued both companies, seeking a declaratory judgment and asserting breach of contract claims after disputes as to coverage limits and inclusion of litigation costs in those limits. The parties filed cross-motions for partial summary judgment, and the trial court granted the motions in part and denied

them in part. In Case No. A18A1173, the defendants appeal, arguing that the trial court erred by ruling that: (1) the non-cumulation provisions in certain National Union policies are ambiguous, and therefore, Scapa can "stack" the limits of each primary policy; and (2) the New Hampshire excess policy is obligated to defend and indemnify Scapa upon exhaustion of all primary policies that overlapped in time with the excess policy periods, as opposed to until after exhaustion of every primary policy issued to Scapa for any time period. In Case No. A18A1174, Scapa appeals, arguing that the trial court erred by concluding that defense costs erode the policy limits of the 1986 and 1987 National Union policies. We have consolidated the appeals for review, and for the reasons that follow, we affirm in Case No. A18A1173, and we reverse in Case No. A18A1174.

"On appeal from the grant of summary judgment this [C]ourt conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[1]

---

[1] (Citation and punctuation omitted.) *Donovan v. State Farm Mut. Auto. Ins. Co.*, 329 Ga. App. 609, 610 (765 SE2d 755) (2014).

So viewed, the record shows that from 1958 to 1976, Scapa manufactured and sold, among other things, asbestos-containing dryer felts, which were used in producing paper. For the period from 1983-1987, Scapa purchased five consecutive primary annual policies from National Union, which policies obligate National Union (a) to pay on behalf of Scapa "all sums" which Scapa "shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence . . ." and (b) "to defend any suit against [Scapa] seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false[,] or fraudulent. . . ."[2] The 1983, 1984, and 1985 National Union policies have limits of $1 million for each occurrence and $1 million in the aggregate. For the 1986 and 1987 renewal policies, the liability limits were amended by two endorsements — one which sets the total liability limit for "Ultimate Net Loss" resulting from any one occurrence to $7.2 million, and another which contains a non-cumulation provision.

Scapa also purchased annual liability coverage from New Hampshire, National Union's sister company. The New Hampshire policy was initially issued for the

---

[2] The 1983-1987 National Union policies did not contain an asbestos exclusion, The 1988 renewal policy and each renewal policy thereafter exclude coverage for asbestos claims.

period from March 31, 1983, through March 30, 1984 ("the 1983 policy"), and it was then renewed for the next four years. With limited exceptions not relevant to this appeal, the renewal endorsements only amended the limits of liability.

In April and August of 2014, Resolute Management, Inc. — the third-party administrator and claims handler for National Union with respect to the relevant asbestos claims — advised Scapa that it was close to exhausting what National Union contended were its $7.2 million policy limits. National Union took the position that under the non-cumulation provisions contained in the 1986 and 1987 policies, liability was capped at $7.2 million, rather than the $17.4 million aggregate coverage of all five policies. National Union also counted defense costs against policy limits.[3] On November 6, 2014, Resolute advised Scapa that the limits of liability for all National Union policies had been exhausted.

Scapa sued National Union in 2014, and it later added New Hampshire as a defendant. In the second amended complaint, Scapa sought a declaratory judgment and damages for breach of contract based upon the defendants' discontinuation and denial of insurance claims. The defendants asserted counterclaims for declarations

[3] In the August 2014 letter, National Union indicated that it had paid out approximately $823,000 in judgments and/or settlements, and it had paid approximately $6.32 million in defense expenses.

4

regarding coverage and limits of coverage. The parties then filed cross- motions for summary judgment, and the trial court granted the motions in part and denied them in part, holding that: (a) the non-cumulation provision in the National Union policies is ambiguous, and therefore, Scapa can "stack" the limits of each primary policy; (b) New Hampshire's obligations under the excess policies are triggered by exhaustion of the National Union primary policies covering the same policy periods; and (c) defense costs erode the policy limits of the 1986 and 1987 National Union policies. These appeals followed.[4]

When considering appeals involving insurance contract interpretation, we are guided by the following principles:

> Construction and interpretation of an insurance policy are matters of law for the court. An insurance policy is a contract and subject to the ordinary rules of contract construction, and the parties are bound by its plain and unambiguous terms. However, if a provision of an insurance

---

[4] This is the third time these cases have been docketed in this Court. In Case Nos. A16A1186 and A16A1187, the parties appealed the trial court's ruling on their cross-motions for partial summary judgment; this Court remanded those cases for inclusion of a legible copy of the National Union insurance policies. After purportedly completing the record, the parties filed new notices of appeal, which were docketed as Case Nos. A17A1268 and A17A1269, which cases were again remanded for legible copies of the policies. The policy has now been retyped, and the trial court entered an order reflecting the completion of the record.

contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied.[5]

Under these rules,

any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and the insurance contract is to be read in accordance with the reasonable expectations of the insured where possible. When applying these rules, the policy must be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others.[6]

*Case No. A18A1173*

1. The defendants contend that the trial court erred by ruling in favor of Scapa on its claim that the limits of the 1983-1987 National Union primary policies can be stacked because the non-cumulation provision in the 1986 and 1987 policies upon which National Union relies is ambiguous. This enumeration is without merit.

---

[5] (Citations and punctuation omitted.) *American Strategic Ins. Corp. v. Helm*, 327 Ga. App. 482, 485 (759 SE2d 563) (2014).

[6] (Citations and punctuation omitted.) Id. at 487.

6

Endorsement #10 in the 1986 and 1987 National Union policies, entitled "Worldwide Non-Cumulative Limits of Liability Endorsement," provides, in relevant part:

> If . . . for any reason [Scapa] has been provided with more than one policy by [National Union] covering the same loss/losses, the limit of liability stated in the schedule of this endorsement is the total limit of [National Union's] liability for all damages which are payable under such policies. Any loss incurred under this policy shall serve to reduce and shall therefore be deducted from the total limit of [National Union's] liability.

National Union argued on summary judgment that this endorsement, which appears only in the last two renewal policies, amends all five policies and limits coverage to the $7.2 million policy limit specified in the final policy period, rather than the total $17.4 million coverage provided by the policies. But the non-cumulation provision does not indicate whether the limit applies to the policy period only or to the aggregate period under the original and renewed policies. And as the trial court properly concluded, "[w]e must construe this ambiguity in favor of the insured."[7] Thus, the trial court properly ruled in favor of Scapa on this issue.

---

[7] *Sherman & Hemstreet, Inc. v. Cincinnati Ins. Co.*, 277 Ga. 734, 736 (1) (594 SE2d 648) (2004) (holding that a non-cumulation clause was ambiguous because it

7

2. The defendants also argue that the trial court erred by concluding that New Hampshire's obligations under its policies are triggered by exhaustion of the National Union primary policies issued during the same periods. We disagree.

The Insuring Agreement of the 1983 policy required New Hampshire to "indemnify [Scapa] for all sums which [Scapa] shall become legally liable to pay as [d]amages or [c]ompensation . . . caused by an [o]ccurrence, on account of [p]ersonal [i]njury . . . or [p]roperty [d]amage."[8] The "other insurance" clause of the 1983 New Hampshire policy provides in relevant part:

> The insurance afforded by this [p]olicy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. . . . *This insurance does not cover any loss or damage which at the time of the happening of such loss or damage is insured by*

could be interpreted to mean that the limit applied to the policy period only or to the aggregate period under the original and renewed policies).

[8] "Personal [i]njury" is defined as "[b]odily injury, sickness, disease[,] or death at any time. . . ." "Occurrence" is defined as "an accident and includes continuous or repeated injurious exposure to substantially the same general conditions which results during the [p]eriod of [i]ndemnity in [p]ersonal [i]njury or [p]roperty [d]amage neither expected nor intended from the standpoint of [Scapa]." The parties conceded below that a "continuous trigger" theory applies to the asbestos claims in this case. "With a continuous trigger, all liability policies in effect from the exposure to manifestation provide coverage and are responsible for the loss." *Arrow Exterminators, Inc. v. Zurich American Ins. Co.*, 136 FSupp2d 1340, 1346 (III) (A) (N. D. Ga. 2001).

8

*any valid and collectible insurance* or would but for the existence of this [p]olicy, be insured by any other existing valid and collectible [p]olicy or [p]olicies except in respect of any excess beyond the amount which would have been payable under such other [p]olicy or [p]olicies had this insurance not been effected.[9]

Paragraph (c) of the clause requires Scapa to "*maintain the underlying policies which are in force at the commencement of this insurance*[,] and any reduction in the coverage provided by same should be advised to [New Hampshire] as soon as practicable."[10]

Scapa maintains that upon exhaustion of the National Union policies for the same years, New Hampshire, as the excess carrier, is obligated to "drop down" and defend Scapa. New Hampshire, however, contends that pursuant to the "other insurance" clause, it has no obligation to defend or indemnify Scapa until every other policy issued to Scapa for any time period is exhausted.

---

[9] (Emphasis supplied). The "other insurance" provision applies to each renewal period of the New Hampshire policy. See *Pennsylvania Millers Mut. Ins. Co. v. Dunlap*, 153 Ga. App. 116, 118 (1) (264 SE2d 483) (1980) ("'By the renewal of a policy, except where there is a special agreement for different terms, the original policy is continued under the original stipulations, and the only change is in the time of its expiration.'").

[10] (Emphasis supplied).

But the policy language does not state that Scapa must exhaust all other policies issued at any other time before New Hampshire's duties to defend and indemnify are triggered. Instead, taking into consideration the requirement in paragraph (c) of the "other insurance" clause that Scapa maintain those underlying policies in force at the commencement of the New Hampshire policies,[11] New Hampshire is obligated to defend and indemnify Scapa upon exhaustion of all primary coverage that overlapped in time with the excess policy periods.[12] Thus, the trial court did not err by ruling in favor of Scapa and against New Hampshire on this issue.

*Case No. A18A1174*

3. Scapa contends that the trial court erred by finding that defense costs erode the policy limits of the 1986 and 1987 National Union policies. We agree.

National Union argues that pursuant to Endorsement #4 in the 1986 and 1987 policies, defense costs erode the total liability limits of those policies. Endorsement

---

[11] See *Helm*, 327 Ga. App. at 487 ("the policy must be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others").

[12] To the extent that the "other insurance clause" is ambiguous, such ambiguity must be construed in favor of Scapa as the insured. See id.

10

#4 states that the total liability limit for "Ultimate Net Loss" resulting from any one occurrence is $7.2 million. "Ultimate Net Loss" is defined in the 1986 policy as

> [t]he total sum which [Scapa] or [National Union] as its insurer, or both, become obligated to pay due to any [b]odily [i]njury . . . including all expenses incurred by [National Union], all costs taxed against [Scapa] in any claim, suit[,] or other action defended by [National Union] and all interest on the entire amount of any judgment. . . ."

"Ultimate Net Loss" is defined the same in the 1987 policy except that it states "become obligated to pay due to any [b]odily [i]njury *and/or [p]roperty [d]amage* including all expenses incurred by [National Union]. . . ."[13]

National Union contends that the phrase "all expenses incurred by [National Union]" includes defense costs. Even assuming this contention is correct, the $7.2 million limit is eroded only by the total sums that National Union "*become[s] obligated to pay due to*" any bodily injury or, in the case of the 1987 policy, due to any bodily injury or property damage.[14] The endorsement is, as the trial court concluded, ambiguous as to whether such expenses include defense costs National Union is obligated to pay solely as part of its contractual duty to defend (as opposed

---

[13] (Emphasis supplied).

[14] (Emphasis supplied).

11

to those sums it is legally obligated to pay by reason of the liability imposed upon Scapa by law for damages). Again, any ambiguity must be construed in favor of Scapa as the insured.[15] Accordingly, the trial court erred by concluding that the policy limits for the 1986 and 1987 National Union policies were eroded by defense costs.[16]

*Judgment affirmed in Case No. A18A1173 and reversed in Case No. A18A1174. Dillard, C. J., and Mercier, J., concur.*

---

[15] See *Helm*, 327 Ga. at 487.

[16] Scapa argues that National Union has demonstrated on numerous occasions over the past 20 years conduct inconsistent with its current position that defense costs erode policy limits, including: failing to respond to Scapa's written request that any of its insurers advise if it intends to assert that defense costs count against policy limits; failing to assert such a position in reservation of rights letters; creating internal documents listing remaining policy limits that did not include defense costs; filing an affidavit of coverage with a Maryland court in 2014 that Scapa had $16.4 million in coverage for asbestos liabilities, without noting that such limits were eroded by defense costs; and applying for a $16.2 million appeal bond in 2011, stating to the surety that the 1986 policy had a full $7.2 million in coverage, again without stating that such limits were eroded by defense costs. We do not consider this argument, however, in light of our holding regarding the policy language.