NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 11

No. 2021-081

In re Ambassador Insurance Company
(Bestwall LLC, Appellant)

Supreme Court

On Appeal from
Superior Court, Washington Unit,
Civil Division

November Term, 2021

Helen M. Toor, J.

Andre D. Bouffard of Downs Rachlin Martin PLLC, Burlington, for Appellant.

Jacqueline A. Hughes, Montpelier, Jay Lavroff of Lindabury, McCormick, Estabrook &
  Cooper, P.C., Westfield, New Jersey, and Jennifer Rood, Assistant General Counsel and
  Special Assistant Attorney General, Department of Financial Regulation, Montpelier, for
  Appellee.


PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Dooley, J. (Ret.),
           Specially Assigned


¶ 1.     **REIBER, C.J.**    In this interlocutory appeal, we consider whether Vermont or Georgia law applies to a coverage dispute between claimant Bestwall LLC and insurer Ambassador Insurance Company. Bestwall contends that the trial court erred in concluding that Vermont law applies following the special master's prediction that Georgia courts would adopt the same loss-allocation method as Vermont. But because Georgia law is unsettled on this issue, we conclude that there is no conflict with Vermont law and accordingly, Vermont law applies. We therefore affirm the trial court's grant of partial summary judgment to Ambassador.

¶ 2.     The following material facts are undisputed. Bestwall Gypsum Company produced and sold products containing asbestos since its incorporation in 1956. Georgia Pacific Corporation

(GP) acquired Bestwall Gypsum in 1965 and assumed Bestwall Gypsum's liabilities. GP continued selling products containing asbestos until 1977. In 1982, GP moved its headquarters to Atlanta, Georgia.

¶ 3.    From 1965 to 1986, GP maintained commercial general liability insurance through various insurers. GP's insurance program included multiple layers of primary and excess coverage in several of those years.

¶ 4.    Ambassador Insurance Company was one insurer who covered GP during part of this period. Ambassador was incorporated in Vermont in 1965 and had an office in Berlin, Vermont. Ambassador was also licensed in New Hampshire, Arizona, and Nevada, and had offices in several states, including New Jersey. Ambassador was not licensed to sell insurance in Georgia, where GP was headquartered, but acted as a surplus-lines insurer.

¶ 5.    In 1983, GP negotiated and entered into the excess liability policy at issue through Ambassador's Georgia-based surplus-lines broker. The policy was purchased and delivered in Georgia. Under the policy, Ambassador agreed to provide up to $10 million as a portion of GP's total excess liability coverage of $75 million. The policy promised to indemnify GP for the "Ultimate Net Loss which [GP] shall become legally obligated to pay in excess" of the limits of underlying policies "resulting from an occurrence or occurrences" covered by those policies. In other words, GP's losses needed to exhaust the $100 million that GP had in underlying coverage to trigger Ambassador's excess coverage. The policy stated that Ambassador's coverage followed that of the underlying policies, and at least one underlying policy limited coverage to bodily injury "which occurs during the policy period." Although the policy was written to be effective from April 1, 1983, to April 1, 1984, GP cancelled the policy on May 15, 1983, after it decided to replace its entire insurance program. Ultimately, the policy was in effect for forty-four days, for which Ambassador collected a net premium of $605.

2

¶ 6.    In November 1983, Ambassador was placed into receivership due to its "hazardous financial condition." In re Ambassador Ins. Co., 2015 VT 4, ¶ 2, 198 Vt. 341, 114 A.3d 492 (quotation omitted). In 1987, the Vermont superior court ordered Ambassador into liquidation and appointed as liquidator the Commissioner of the Vermont Department of Banking and Insurance (now the Vermont Department of Financial Regulation). See id. ¶¶ 2 n.1, 5 & n.3. The court order authorized the liquidator to determine claims filed by Ambassador's insureds in the liquidation proceeding, and provided that if the liquidator denied a claim, the claimant could seek review in Vermont superior court. The order further provided that the court could appoint a master to hear the disputed claim under Vermont Rule of Civil Procedure 53.

¶ 7.    Since the early 1980s, GP has faced many lawsuits across the country alleging personal injury and death resulting from exposure to GP's asbestos-containing products. GP has incurred approximately $2.9 billion in losses. GP's insurers have covered approximately $850 million of GP's losses. In 2017, GP was restructured, and Bestwall LLC acquired its asbestos liabilities.[1]

¶ 8.    Bestwall filed a claim with the liquidator for coverage under the Ambassador policy, and the liquidator denied the claim. Bestwall appealed that denial to the Vermont superior court. In accordance with the liquidation order, the court appointed a special master to hear the claim. The special master divided the proceedings into two tracks: the first to determine threshold legal questions, including choice of law and the method of loss allocation, and the second to allocate loss under the applicable law.

¶ 9.    Bestwall and Ambassador filed cross-motions for partial summary judgment on the track one issues. In relevant part, Bestwall argued that New Jersey law should apply as New Jersey was the state where Ambassador's main office was located at the time it issued the policy. Alternatively, Bestwall argued that Georgia law could apply as the state of Bestwall's

---

[1] Hereinafter, this opinion refers to the company as "Bestwall" for consistency.

incorporation and where its headquarters were located when the policy was issued. Ambassador argued that Vermont law applied.

¶ 10. The special master issued a report granting partial summary judgment to Ambassador. The special master rejected Bestwall's argument that New Jersey law should apply and reasoned that either Vermont or Georgia law could apply to the claim. He then considered whether Georgia law conflicted with Vermont law regarding allocation of loss. He explained that while Vermont law clearly applies pro-rata (or time-on-the-risk) allocation, no appellate court in Georgia had considered this issue. After considering a Georgia state trial court decision and federal district court decision adopting the pro-rata method under Georgia law, the special master predicted that Georgia courts would adopt the pro-rata method. Because Georgia law did not conflict with Vermont law, he concluded that Vermont law applied. He further noted that even if the laws conflicted, Vermont law would still apply under a choice-of-law analysis, given Vermont's interest in Ambassador's liquidation and the clarity in Vermont's allocation law. Applying Vermont law, the special master determined that Bestwall's losses would be allocated under the pro-rata method.

¶ 11. Bestwall filed an objection to the special master's report with the superior court. The court rejected Bestwall's arguments and adopted the special master's ruling. See V.R.C.P. 53(e)(2) (providing that after party objects to master's report, court may adopt it or may modify or reject it wholly or partially).

¶ 12. Bestwall then moved for interlocutory appeal. Bestwall explained that because the Ambassador policy was in place for a short period of time, if Bestwall's losses were allocated to the policy by time under the pro-rata method, the loss would not exceed the underlying coverage necessary to trigger Ambassador's policy and Bestwall's claim would fail. The court granted Bestwall's motion for interlocutory appeal. See V.R.A.P. 5(b)(1) (requiring court to allow appeal from interlocutory ruling that involves "controlling question of law about which there exists

4

substantial ground for difference of opinion" and where "immediate appeal may materially advance" end of lawsuit).

¶ 13. On appeal, Bestwall argues that the trial court erred by concluding that Vermont law applied to this claim. Bestwall contends that choice-of-law principles support application of Georgia law and urges us to predict that the Supreme Court of Georgia would reject pro-rata allocation and instead adopt all-sums allocation under the terms of this policy. Bestwall emphasizes that if pro-rata allocation applies, its claim will be denied; it maintains that Georgia law would not support this outcome where the policy language does not specifically require pro-rata allocation. Bestwall also suggests that applying Vermont law could run afoul of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. In its reply brief, Bestwall clarifies that we should reach the choice-of-law analysis because, in the face of unsettled law in Georgia, this Court should presume that Georgia law conflicts with Vermont law.

¶ 14. We review grants of summary judgment without deference, using the same standard as the superior court. Brillman v. New Eng. Guar. Ins. Co., 2020 VT 16, ¶ 6, 211 Vt. 550, 228 A.3d 636. "We will affirm summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id. (quotation omitted); see V.R.C.P. 56(a). The parties do not dispute the material facts; they disagree about the law governing this dispute. Determining which state's law governs this claim is a question of law, which we review without deference. See Miller v. White, 167 Vt. 45, 47-48, 702 A.2d 392, 393 (1997). Courts apply the choice-of-law rules of the forum state in determining which jurisdiction's substantive law applies to the issue at hand. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 488 (1941). Accordingly, we apply Vermont's choice-of-law rules.

¶ 15. This Court has adopted the analysis set forth in the Restatement (Second) of Conflict of Laws to resolve choice-of-law issues in contract cases. McKinnon v. F.H. Morgan & Co., 170 Vt. 422, 423, 750 A.2d 1026, 1028 (2000). The Restatement essentially asks us to

5

consider several factors to determine which state has the most significant relationship to the insurance contract. See Martineau v. Guertin, 170 Vt. 415, 417, 751 A.2d 776, 778 (2000) (explaining that Restatement approach allows courts to "weigh the most significant factors in any given case" and directs us to apply specific sections of Restatement depending on legal issue); see also Restatement (Second) of Conflict of Laws, § 6 (1971) (listing general choice-of-law principles); id. § 188 (listing contract principles); id. § 193 (listing insurance contract principles).

¶ 16. Bestwall argues that the Restatement factors strongly favor application of Georgia law—so strongly that the special master erred by "even consider[ing] whether Vermont's law conflicts with Georgia's on the issue of allocation." But this argument misunderstands the choice-of-law inquiry. Before analyzing the issue under the factors set forth in the Restatement, we must first consider whether Georgia law actually conflicts with Vermont law. See Havill v. Woodstock Soapstone Co., 172 Vt. 625, 627, 783 A.2d 423, 427 (2001) (mem.) (establishing that where no conflict exists, Vermont courts avoid choice-of-law analysis and apply forum law); see also Cont'l Ins. Co. v. Honeywell Int'l, Inc., 188 A.3d 297, 311 (N.J. 2018) ("The first step in a conflicts analysis is to decide whether there is an actual conflict between the laws of the states with interests in the litigation.").

¶ 17. The law of another jurisdiction, or foreign law, "is a question of fact and must be proved as such." Gen. Acceptance Corp. v. Lyons, 125 Vt. 332, 335, 215 A.2d 513, 515 (1965) (quotation omitted). The proponent of foreign law—here, Bestwall—bears the burden of demonstrating that foreign law conflicts with Vermont law. Id. (explaining that in absence of showing of conflict, Court presumes foreign law to be same as Vermont law); see also Pioneer Credit Corp. v. Carden, 127 Vt. 229, 234, 245 A.2d 891, 894 (1968) (providing that where proponent failed to prove conflict, trial court could apply Vermont law under assumption that it was same as foreign law "so long as [assumption] is reasonable and does not impose oppressive consequences").

¶ 18.     We conclude that no conflict exists.  Under Vermont law, pro-rata allocation would apply to this insurance policy, but no Georgia appellate court has squarely addressed this question.  We thus must consider whether Vermont courts should assume that a conflict exists in circumstances where foreign law is unsettled.  We conclude that in the face of unsettled law, Bestwall must show with reasonable certainty that Georgia law plainly and materially conflicts with Vermont law.  Although Bestwall has set forth the Georgia law that exists, Bestwall has not pointed us to a precedential state decision or other clearly established law determining how Georgia courts allocate loss in the same or similar circumstances.  Without such proof, Bestwall has not shown, nor can it show with reasonable certainty, that Georgia courts would reject pro-rata allocation and instead apply all-sums allocation.  For the reasons set forth in greater detail below, we conclude that Vermont law applies.

I.

¶ 19.     Before trying to identify whether there is settled law of Georgia and Vermont regarding the allocation of loss under multiple insurance policies, it is helpful to summarize the insurance concepts at play.  Occurrence-based policies cover losses that occur during the policy period.  Bradford Oil Co., v. Stonington Ins. Co., 2011 VT 108, ¶ 7, 190 Vt. 330, 54 A.3d 983.  When loss results from "environmental contamination that is continuous or progressively deteriorating through successive policy periods," such as exposure to asbestos that manifests as bodily injury at a later time, many courts apply a "continuous-trigger" theory to determine whether the exposure triggers coverage.  Towns v. N. Sec. Ins. Co., 2008 VT 98, ¶ 25, 184 Vt. 322, 964 A.2d 1150.  Under this theory, exposure that occurred during the policy period triggers coverage, regardless of when the damage was discovered.  Id. ¶ 28.  The parties do not dispute that the continuous-trigger theory applies here to trigger coverage.  This means that the Ambassador policy potentially covers all claims made against Bestwall for injury from asbestos exposure first

7

occurring before or during the time that the policy was effective, April 1 to May 15, 1983, but not manifested until the policy was in effect or later.

¶ 20. After determining the appropriate trigger of coverage, the next step is to decide how to allocate the insured's losses across the triggered years of coverage. There are two general approaches. The first is all-sums allocation, also known as joint-and-several liability. Under this approach, all triggered policies are responsible for the entire loss and must provide coverage up to the policy limit, so long as the occurrence took place in part during the policy period. Id. ¶ 33. If the all-sums approach applied here, Ambassador could be liable to pay out the policy limit of $10 million. The second is pro-rata or time-on-the-risk allocation. Under this approach, courts allocate a portion of the loss to each insurer based on the proportion of time that the insurer covered the risk relative to the total time of triggered coverage. Id. If the pro-rata approach applied here, Bestwall's total losses would be allocated to Ambassador based on the forty-four-day period that the policy was in place. Despite Bestwall's $2.9 billion in losses, the policy was in place for such a short period of time that Bestwall contends that the allocated loss would not trigger Ambassador's policy.[2]

¶ 21. Vermont law is settled on this issue. Under Vermont law, the court would apply the pro-rata method to allocate Bestwall's loss under the Ambassador policy. In Towns, this Court adopted the pro-rata method to allocate loss under occurrence-based policy language in a homeowners' insurance policy that limited coverage to damages occurring "during the policy period." Id. ¶¶ 34-38. We reasoned that where a continuous trigger applies to damage occurring over a long period of time, it is appropriate to allocate liability to each insurer "proportionate to the damage suffered during its policy's term" when the policy contained language "limiting coverage to damages occurring during the policy term." Id. ¶ 34. Otherwise, the insurer could be

_____

[2] While Bestwall concedes this point on appeal, the trial court has yet to apply the selected allocation method and determine whether coverage exists.

8

liable for losses that occurred outside the policy period, rendering the policy language meaningless. In Bradford Oil, we extended this holding to similar language in a commercial general-liability policy. 2011 VT 108, ¶¶ 10-13. Here, the Ambassador excess-liability policy follows the form of underlying policies and at least one of the underlying policies was occurrence-based, meaning that it limited coverage to bodily injury "which occurs during the policy period." Thus, as the special master concluded, pro-rata allocation applies to this policy under Towns and Bradford Oil.

¶ 22. The Supreme Court of Georgia, however, has not yet decided this issue. Nor has the Court of Appeals of Georgia issued a decision on this issue which we might follow in the absence of a decision from the state's highest court. See Stoner v. N.Y. Life Ins. Co., 311 U.S. 464, 467 (1940) (explaining that where federal court exercises diversity jurisdiction, court "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently"); Moscov v. Mut. Life Ins. Co. of N.Y., 56 N.E.2d 399, 404-05 (Ill. 1944) (explaining that Illinois courts must accept decision of intermediate appellate court as stating law of jurisdiction "in the absence of any conflicting decision by another appellate court of coordinate jurisdiction . . . or by its highest court of review").

¶ 23. The parties direct us to several trial court decisions confronting this issue under Georgia law. In two cases, Georgia superior courts determined that the pro-rata method was appropriate under the plain language of occurrence-based policies which limited coverage to risks occurring "during the policy period." Nat'l Serv. Indus., Inc. v. Md. Cas. Co., No. E22907 (Ga. Super. Ct. Feb. 21, 2001); Nat'l Serv. Indus. v. St. Paul Guardian Ins. Co., No. 2004-cv-83960, 2005 WL 5958768 (Ga. Super. Ct. June 7, 2005). It is axiomatic, however, that orders of the Superior Court of Georgia do not bind the Georgia appellate courts. Cf. Etkind v. Suarez, 519 S.E.2d 210, 215 (Ga. 1999) (explaining that Supreme Court of Georgia decision "constitutes controlling authority" and must be followed by Court and all lower courts unless overruled or law

changed by legislature); Harvey v. J.H. Harvey Co., 568 S.E.2d 553, 558 (Ga. Ct. App. 2002) (recognizing that Court of Appeals of Georgia is "bound by the precedent of the Supreme Court").

¶ 24.    Two federal district courts have also confronted this issue under Georgia law.  In Liberty Mutual Insurance Co. v. Fairbanks Co., the Southern District of New York reasoned that "well established principles of contract interpretation support applying a pro rata approach" where the plain language of the policy covered loss occurring "during the policy period."  170 F. Supp. 3d 634, 651 (S.D.N.Y. 2016) (quotation omitted).   The Northern District of Georgia, however, reached the opposite conclusion in ACE American Insurance Co. v. Exide Technologies Inc., 1:16-cv-1600-MHC, 2017 WL 11629194, *11 (N.D. Ga. Sept. 20, 2017).  There, the court concluded that absent explicit language mandating pro-rata allocation, policy language limiting coverage to risks during the policy period did not require this allocation under Georgia law.  Id.  While these cases apply relevant principles of Georgia law, they do not establish precedential state law.  Federal courts sitting in diversity jurisdiction apply substantive state law under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and "[w]here the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is to carefully predict how the highest court of the forum state would resolve the ambiguity."  Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994).  However, "[s]uch a predictive judgment is not, in fact, state law; it is an 'Erie guess' as to what state law would be."  Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co., 2014 IL 116389, ¶ 16, 10 N.E.3d 902 (quotation omitted).  As such, orders of federal district courts applying state law do not bind state courts.  See U.S. Fid. & Guar. Co. v. Kelley, 205 S.E.2d 38, 39 (Ga. Ct. App. 1974) ("[D]ecisions of the United States District Court are not binding on us").

¶ 25.    As the two federal district courts noted, Georgia appellate courts have yet to rule on this issue.  See Liberty Mut. Ins. Co., 170 F. Supp. 3d at 650 ("Georgia appellate courts have not yet addressed the issue of allocation of liability in a progressive injury case."); ACE Am. Ins. Co., 2017 WL 11629194, *11 (noting that under Georgia law, "the question of how a judgment

10

should be allocated among various insurers—which has divided courts elsewhere—remains unsettled"). Indeed, the fact that the Northern District of Georgia reached a conflicting conclusion on loss allocation from the Superior Court of Georgia and the Southern District of New York supports our observation that this issue is unsettled under Georgia law. Bestwall points to no new Georgia authority directly addressing this issue since those cases were decided. In short, Georgia law remains unsettled on the issue of allocation.

## II.

¶ 26. In the face of uncertain law, Bestwall argues that we should presume that a conflict exists, pointing to Havill v. Woodstock Soapstone Co.[3] In Havill, we compared the laws of Vermont and New Hampshire and determined that the laws did not conflict. 172 Vt. at 627-28, 783 A.2d at 427-28. Bestwall argues that under Havill, this Court will conclude that no conflict exists only where foreign law is the same as forum law, so applying foreign law would result in the same outcome. Thus, in Bestwall's view, we should presume a conflict exists where the law is unsettled as we cannot conclude that Vermont law is the same as Georgia law. However, Havill did not address a situation where foreign law is unsettled.

¶ 27. Some courts have adopted the approach that Bestwall proposes. As Bestwall notes, some federal courts assume that a conflict exists when confronted with unsettled state law or when a "potential" conflict exists. See, e.g., In re Thelan LLP, 736 F.3d 213, 219 (2d Cir. 2013) (noting that where state law is unresolved, court "assume[s] there to be a conflict" and proceeds to apply choice-of-law principles); Med. Graphics Corp. v. Hartford Fire Ins. Co., 171 F.R.D. 254, 260 (D.

---

[3] In the proceedings below, Bestwall argued that the court was obligated to predict how the Supreme Court of Georgia would decide this issue before it could determine whether a conflict exists. The special master agreed and predicted that Georgia courts would adopt the pro-rata method. To the extent that Bestwall pursues this argument on appeal, we disagree that we are obligated to make a prediction before determining whether a conflict exists on comparison of state law. While we acknowledge the authority of state courts to predict the law of another jurisdiction in appropriate situations, we decline to do so here. As our discussion below illustrates, many federal and state courts resolve conflict-of-law issues involving uncertain law without prediction. Infra, ¶¶ 27-28.

Minn. 1997) (explaining that where foreign law is uncertain, "there is a potential of actual conflict, and [the court] must engage in a choice of law analysis." (quotation omitted)). Likewise, the Supreme Court of Connecticut explained that where one state lacked controlling appellate precedent on an issue, "the trial court should have addressed the conflict of laws issue to determine which state's law to apply." Dugan v. Mobile Med. Testing Servs., Inc., 830 A.2d 752, 758 (Conn. 2003).

¶ 28.    Other states, however, require evidence of controlling precedent and require the proponent of foreign law to affirmatively show that it differs from forum law. Under this approach, unsettled law does not create an actual conflict. For example, Washington State requires the proponent of foreign law to present "sufficient proof to establish with reasonable certainty the substance of the foreign principles of law." B.C. Ministry of Health v. Homewood, 970 P.2d 381, 384 (Wash. Ct. App. 1999) (quotation omitted). Absent foreign law established with reasonable certainty, Washington courts apply forum law. Id. A federal district court in Washington applied this standard to a similar choice-of-law dispute between Washington law, which applied the all-sums allocation method, and British Columbia law, which was unsettled. Teck Metals, Ltd. v. Certain Underwriters at Lloyds', 735 F. Supp. 2d 1231, 1234 (E.D. Wash. 2010). The insurer pointed to a decision of the British Columbia Court of Appeals that seemed to support pro-rata allocation in one circumstance; the insured countered that the case was factually distinguishable and the issue remained unsettled. The court concluded that the insurer failed to prove with reasonable certainty that an actual conflict existed. Id. at 1239. Similarly, the Supreme Court of Illinois has explained that the "mere possibility of a conflict of laws" does not create an actual conflict and concluded that the "choice-of-law determination is required only when the moving party has established an actual conflict between state laws." Bridgeview Health Care Ctr., 2014 IL 116389, ¶ 25; see also Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶¶ 1, 37, 188 P.2d 1156 (holding that, under New Mexico law, standard for determining actual conflict in context of class-

action certification is "more than a mere hypothetical conflict or uncertainty based on the lack of foreign appellate precedent;" proponent must show that laws of relevant states "actually conflict through clearly established, plainly contradictory law" such that "<u>material</u> conflict" exists).

¶ 29.   Considering these competing approaches, we conclude that to demonstrate an actual conflict with Vermont law, the proponent must present proof of precedential foreign law that shows with reasonable certainty a plain and material conflict with forum law.  This standard aligns with our cases placing the burden of proof on the proponent of foreign law.  See <u>Lyons</u>, 125 Vt. at 335, 215 A.2d at 515-16; <u>Carden</u>, 127 Vt. at 234, 245 A.2d at 894.  A contrary holding would essentially flip the burden; if the proponent could rely on uncertainty to show a potential conflict, the standard would require the opponent of foreign law to disprove a hypothetical or potential conflict.  See <u>Ferrell</u>, 2008-NMSC-042, ¶¶ 35-36.  As the Supreme Court of Illinois recognized, "[t]here is always a 'potential' for differences to arise on state-law questions" and the " 'potential' conflict standard would appear to create substantial uncertainty in deciding what law to apply." <u>Bridgewater Health Care Ctr.</u>, 2014 IL 116389, ¶ 25.

### III.

¶ 30.   When applied to this case, Bestwall has not met its burden to show with reasonable certainty that Georgia law conflicts with Vermont law.  Unlike <u>Lyons</u> and <u>Carden</u>, this is not a case where Bestwall has failed to argue that foreign law should apply or set forth its principles. See <u>Lyons</u>, 125 Vt. at 335, 215 A.2d at 516 (applying Vermont law where plaintiff failed to plead or prove foreign law); <u>Carden</u>, 127 Vt. at 234, 245 A.2d at 894 (same).  By contrast, Bestwall has set forth specific claims regarding Georgia law.  Relying on this body of law, Bestwall argues that the Supreme Court of Georgia will reject policy interpretations that result in the denial of coverage unless expressly required by the policy language, and therefore all-sums allocation is closer to the Georgia law it cites in this case.

13

¶ 31.    In support of its argument, Bestwall first contends that Georgia has a "public policy of complete compensation" requiring that courts construe insurance policies in favor of coverage unless the policy clearly dictates otherwise, citing Davis v. Kaiser Found. Health Plan of Ga., Inc., 521 S.E.2d 815, 816 (Ga. 1999).  However, the complete-compensation policy is not a broad principle of insurance contract construction but instead involves subrogation or reimbursement, issues that do not apply here.  See Duncan v. Integon Gen. Ins. Corp., 482 S.E.2d 325, 326 (Ga. 1997).  Bestwall also argues that Georgia courts read insurance policies "in accordance with the reasonable expectations of the insured where possible," Boardman Petroleum Inc. v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998) (quotation omitted), and construe ambiguities "strictly against the insurer/drafter and in favor of the insured," Ga. Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 425 (Ga. 2016).  These general principles mirror the law in Vermont.  See Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co., 2004 VT 124, ¶ 23, 177 Vt. 421, 869 A.2d 82 ("[W]e construe insurance policies in favor of the insured, in accordance with the insured's reasonable expectations for coverage based on the policy language."); N. Sec. Ins. Co. v. Doherty, 2009 VT 27, ¶ 8, 186 Vt. 598, 987 A.2d 253 (mem.) (noting that ambiguities are "construed in favor of coverage" to protect insured).

¶ 32.    Bestwall next turns to two decisions by the Georgia Court of Appeals, neither of which squarely address loss allocation.  First, Bestwall argues that the Georgia Court of Appeals "criticized and rejected the pure time-on-risk approach" and "essentially employed" the all-sums method in Columbia Casualty Co. v. Plantation Pipeline Co., 790 S.E.2d 645 (Ga. Ct. App. 2016). Contrary to Bestwall's characterization, the court did not essentially employ the all-sums method, nor did it criticize or reject the pro-rata approach.  The court concluded that the plain language of the policy, which did not limit coverage to damage occurring during the policy period, obviated the need to determine how to allocate loss between multiple insurers, and in its discussion of the insurer's argument, merely cited in a footnote a commentator who criticized the pro-rata approach.

14

Id. at 649 & n.9.  Moreover, Ambassador's policy is limited to damage occurring during the policy period and is therefore distinguishable from the policy at issue in Columbia Casualty.[4]  Second, Bestwall points to National Union Fire Insurance of Pittsburgh, PA v. Scapa Dryer Fabrics, Inc., 819 S.E.2d 920 (Ga. Ct. App. 2018), a case involving ambiguity in a non-cumulation clause of an insurance policy.  While the court indicated in a footnote that the parties conceded that a continuous trigger applied, the court did not discuss allocation of liability.  Id. at 924 n.8.[5]

¶ 33.  Finally, Bestwall points to ACE American Insurance, in which the Northern District of Georgia applied all-sums allocation under Georgia law.  2017 WL 11629194.  As discussed above, this case does not establish Georgia law and further, its conclusion directly conflicts with the conclusion of other trial courts which have addressed this question under Georgia law.  Supra, ¶¶ 23-25

¶ 34.  In sum, Bestwall points to general rules of Georgia insurance-policy interpretation that are inapplicable or mirror the law in Vermont, two Georgia appellate cases that do not address allocation (one of which is non-precedential), and a federal district court case that conflicts with the reasoning of other trial court cases applying Georgia law.  Without a precedential state decision or other clearly established state law that expressly determines the proper method of loss allocation under the same or even similar circumstances, Bestwall has not met its burden to show that Georgia law plainly and materially conflicts with Vermont law.  Because we conclude there is no actual conflict, we need not conduct a choice-of-law analysis and affirm the trial court's decision to apply

---

[4]  Aside from the merits, Columbia Casualty is not precedential.  Under Georgia court rules, one judge on the panel concurred in judgment only and therefore the opinion is "physical precedent only," meaning that it is "citable as persuasive, but not binding, authority." Ga. Ct. App. R. 33.2(a)(2).  The rule was amended to provide that, effective August 1, 2020, "a published opinion in which a majority of the judges fully concur in the rationale and judgment of the decision is binding precedent."  Ga. Ct. App. R. 33.2(a)(1).

[5]  The special master's report concluded that Scapa "implicitly recognized" pro-rata allocation as applicable.  Because the Georgia Court of Appeals did not determine an allocation method in this case, we cannot conclude that Scapa supports either method.

Vermont law to this matter. See Havill, 172 Vt. at 625, 783 A.2d at 427 (establishing that where no conflict exists, forum law applies). The trial court properly granted summary judgment to Ambassador on this basis.

IV.

¶ 35. Finally, to the extent that Bestwall argues that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits application of Vermont law to this dispute, we conclude this argument lacks merit. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that its choice of law is neither arbitrary nor fundamentally unfair." Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981) (plurality opinion). The contacts relevant to the due-process question may overlap with the factors considered in a choice-of-law inquiry, but the analyses differ. Hague imposes a threshold inquiry to determine whether it is constitutional to apply the forum state's law, distinct from the choice-of-law inquiry which requires a balancing of multiple states' interests. See AT & T Mobility LLC v. AU Optronics Corp., 707 F.3d 1106, 1113 (9th Cir. 2013) (differentiating between due-process analysis and choice-of-law analysis). Further, Hague does not set a demanding threshold. The U.S. Supreme Court has recognized that this test imposes only "modest restrictions on the application of forum law." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818 (1985); see also Sullivan v. Oracle Corp., 662 F.3d 1265, 1271 (9th Cir. 2011) ("A state court is rarely forbidden by the Constitution to apply its own state's law.").

¶ 36. In Hague, the Court upheld the application of Minnesota law to a dispute involving insurance coverage under a policy purchased and delivered in Wisconsin for a car accident that occurred in Wisconsin. The plurality reasoned that three contacts with Minnesota, unconnected to the car accident, sufficed to apply forum law: the decedent commuted to and worked in Minnesota; the insurance company did business in Minnesota; and the decedent's wife, who brought the

16

lawsuit, became a Minnesota resident before filing suit. Hague, 449 U.S. at 313-320. The Court distinguished these contacts from an insignificant or attenuated contact, such as nominal residence in the forum state. Id. at 310-12.

¶ 37. Following this reasoning, we cannot agree that applying Vermont law to this dispute violates Bestwall's due-process rights. Ambassador was incorporated in Vermont and maintained an office here, which the policy identified as Ambassador's home office. Ambassador has been in liquidation in Vermont for decades, under the supervision of the Vermont courts and the Vermont Department of Financial Regulation. The order governing Ambassador's liquidation required Bestwall to pursue its claim in Vermont superior court. As the special master recognized, Vermont has an interest "in regulating domestic insurers," as well as carrying out the goal of the liquidation order to evaluate claims in a manner that "assure[s] an equitable distribution of the most funds possible for covered losses." See also In re Liquidation of Integrity Ins. Co., 49 A.3d 428, 435 (N.J. Super. Ct. App. Div. 2012) (reasoning that insurer's liquidation was relevant to choice-of-law analysis as "the context in which the [coverage claim had] arisen" and concluding that liquidation would "inform but not overwhelm [choice-of-law] analysis").[6] Accordingly, Vermont has "a significant aggregation of contacts with the parties and the occurrence, creating state interests, such that application of its law was neither arbitrary nor fundamentally unfair." Hague, 449 U.S. at 320.

Affirmed.

FOR THE COURT:

_____

Chief Justice

---

[6] Because we need not determine which state's law applies under the Restatement, we do not consider the extent to which an insurer's liquidation weighs into that analysis.