2014 VT 122

# State of Vermont v. Neiman W. Groce

[111 A.3d 1273]

No. 12-479

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed November 14, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Kevin R. Klamm*, Rutland County Deputy State's Attorney, Rutland, and *John R. Treadwell*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant appeals his conviction for sexual assault following a jury trial in Rutland Superior Court on May 22-24, 2012. On appeal, defendant argues that (1) the trial court erred by allowing certain hearsay testimony to be considered by the jury; (2) the trial court erred in scheduling a six-day delay between jury selection and trial without obtaining a waiver from defendant; and (3) the State's use of inflammatory language and arguments regarding complainant's character during closing arguments was plain error. We reverse defendant's conviction and remand for a new trial on the first ground without reaching defendant's other arguments.

¶ 2. Defendant was charged with sexual assault under 13 V.S.A. § 3252(a)(1) on October 15, 2008. At a hearing on March 27, 2012, the trial was set for May 22-24.

¶ 3. At trial, complainant testified that on July 28, 2008, she went out in downtown Rutland with friends, including her boyfriend, Jason Poljacik. She consumed approximately six drinks and admitted to being intoxicated. Eventually, complainant arrived at a

party of ten to twelve people, including defendant, at the house of Nate Barrett and Nathan Cook. Earlier that night, Poljacik separated from the group to socialize with other friends, arriving at the party after the others, which "frustrated and irritated" complainant. After Poljacik arrived, they decided that she would spend the night at the friend's house and that Poljacik would walk to the home they shared in Mendon so that they could get "a little bit of space" before talking things over in the morning.

¶ 4. Shortly after Poljacik left, complainant went to Barrett's bedroom and made calls to a girlfriend, then to Poljacik. She testified that they both acknowledged that they had been drinking and making bad decisions, apologized and said they loved each other, and promised to talk about it in the morning. Complainant then fell asleep on the floor next to the bed. She awoke to an unknown person performing oral sex on her. Disoriented from being awakened, she told the unknown person to stop several times. The person then rolled her onto her back, and initiated sexual intercourse. Complainant continued to say stop, pushed the person off and ran out of the room. At this point, she was still wearing the same t-shirt and skirt she had been wearing earlier that evening. When she stood up, she recognized the perpetrator as defendant, whom she claimed to have met earlier that evening. Using vulgar terms, defendant stated to complainant that he had enjoyed himself.

¶ 5. Complainant made her way to Cook's bedroom, where he was sleeping. According to complainant, defendant chased after her and tried to follow her into Cook's room, but she shut the door to keep him out. Complainant unsuccessfully attempted to wake Cook by calling his name several times, then went downstairs before collapsing in front of her roommate and Barrett. She was very emotional and told them that "he had his fingers in me," although she did not recall whether she said she was raped. She took a shower, still fully dressed. Her roommate and Barrett then drove her home and told Poljacik what had happened. Poljacik called the police to report the crime, and then took complainant to the police station and the hospital for an examination.

¶ 6. Barrett testified that he checked on complainant several times while she was in his bedroom before the incident. The first time, she was on the phone with Poljacik. The second time, complainant was sleeping on the floor next to the bed, and he moved her onto his bed. When Barrett checked on complainant for

a third time he found defendant, whom he had met for the first time that night, lying in bed with her. He moved defendant to the unoccupied room of a third roommate. Barrett was annoyed with defendant but thought defendant was merely looking for a place to sleep — defendant was apologetic and said he had been looking for a place to "pass out." Barrett testified that defendant seemed to be awake, but was acting tired, groggy, and possibly drunk. Barrett returned to the downstairs porch, and approximately twenty minutes later, complainant appeared. She was hysterical, crying uncontrollably, hyperventilating, and, although having trouble speaking, said, "he had his fingers in me." Barrett talked to defendant, who denied wrongdoing and claimed that complainant had consensual oral sex with him.

¶ 7. Poljacik then testified for the State. He confirmed that complainant was upset with him for separating earlier that night, that he had left complainant at the house party for the night, and that they had made up when she called him. He described complainant as hysterical when she arrived home, and he took her to the hospital.

¶ 8. On cross-examination, Poljacik testified that he had a phone conversation with Cook the day after the incident. Cook was good friends with both Poljacik and defendant, and Poljacik was upset with Cook as a result of the incident. Responding to defendant's questions, Poljacik stated that Cook had told him that Cook did not believe complainant had entered his room the night of the incident. The State did not object to this testimony. On redirect, Poljacik testified:

> [Prosecutor] Did Nate Cook in that same telephone conversation indicate to you that he was angry at Neiman Groce?
>
> [Poljacik] Yes, he did.
>
> [Prosecutor] Did he indicate to you that he thought Neiman Groce could have probably done it?
>
> [Poljacik] Yes, he did.

¶ 9. The defense objected to these answers on hearsay and relevance grounds. The court overruled defendant's objections, stating that defendant had "opened the door" by eliciting other hearsay statements from the same phone conversation. Prompted to answer the question a second time, Poljacik responded that

"[Cook] thought that it was not beyond the realm of possibility that [defendant] had done this."

¶ 10. Defendant then presented his case, claiming the incident was a consensual sexual encounter. Defendant argued that complainant's fight with her boyfriend that night motivated her to have consensual sex with defendant. Defendant took the stand and testified that he witnessed complainant using cocaine that night. Defendant also presented expert testimony from a forensic toxicologist that analysis of complainant's urine sample showed that she had used cocaine within two to four days of the incident, although they could not determine the specific day. The expert testified that cocaine use can cause an increased interest in sex, as well as paranoia and delusional thinking, and that alcohol use in conjunction with cocaine intensifies the cocaine high. The defense also highlighted inconsistencies in complainant's story, such as defendant's testimony that he had met complainant for the first time the previous summer and not that night; Cook's testimony that he did not see complainant enter his room that night; and the lack of physical evidence corroborating complainant's story. Finally, defendant argued that the State's witnesses were predisposed to support complainant's story because they were her friends or romantic partner.

¶ 11. During the State's rebuttal, the prosecutor claimed that the defense had presented a version of events which, to be believable, required the jury to conclude that complainant "would go off and be a slut." The State argued as follows:

> Much was made of the fight [between complainant and her boyfriend]. There had to be a fight. There was, but that had — that importance has to be elevated [by defendant]. Why? Because it provides a reason for this woman to be angry at her boyfriend so that she would go off and be a slut. Is there evidence of this second path of that chain? She was not angry with her boyfriend when she fell asleep. She was happy with her boyfriend when she fell asleep. . . . There was no reason for [complainant] to want to have sex with Mr. Groce. There was, however, a reason for Mr. Groce to want to have sex with [complainant].

¶ 12. The jury spent several hours deliberating before indicating that they were hung. The court asked the jury to continue

deliberating. Two hours later the jury returned a verdict of guilty. Defendant appeals.

¶ 13. Defendant first argues that the trial court erred by permitting the State to elicit Cook's statement that "it was not beyond the realm of possibility that [defendant] had done this" through Poljacik's hearsay testimony on redirect examination. We review the trial court's evidentiary rulings for abuse of discretion. *State v. Gemler*, 2004 VT 3, ¶ 11, 176 Vt. 257, 844 A.2d 757. At trial, defendant objected to the admission of Poljacik's testimony on hearsay and relevance grounds. The trial court admitted the testimony on the theory that defendant had "opened the door" by eliciting other hearsay statements from Poljacik and Cook's telephone conversation during Poljacik's cross-examination. These statements pertained to how the incident affected Poljacik and Cook's friendship, and to Cook's recollection of whether complainant entered his room the night of the incident.

¶ 14. ■ Under the "open-door" doctrine, also known as the doctrine of invited error or curative admissibility, a party's use of evidence to create an incomplete or misleading picture opens the door so that the opposing side may, in the court's discretion, use otherwise-inadmissible evidence to "complete the picture with appropriate detail." See *State v. Malshuk*, 2004 VT 54, ¶ 14, 177 Vt. 475, 857 A.2d 282 (mem.); see also *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993) (explaining that "where a proponent introduces inadmissible evidence, a court may permit the opponent to introduce similarly inadmissible evidence in rebuttal or engage in otherwise-improper cross-examination"). This doctrine "recognizes that evidence that may be inadmissible for the prohibited purpose may be admitted for other permissible purposes." *State v. Recor*, 150 Vt. 40, 44, 549 A.2d 1382, 1386 (1988). The doctrine is not, however, an invitation to admit all nominally related information as evidence. The open-door doctrine "should be applied only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *State v. Percy*, 146 Vt. 475, 482, 507 A.2d 955, 959 (1986) (quotation omitted); see also *Martinez*, 988 F.2d at 702 (holding that only evidence necessary to rebut misleading statements and to "neutralize or cure any prejudice" created by the "incomplete picture" is admissible); *State v. Batchelor*, 135 Vt. 366, 369, 376 A.2d 737, 740 (1977) (stating that open-door doctrine is not tool for "prosecutorial 'over-kill' ").

¶ 15. The State argues that admission of Poljacik's statement on redirect was necessary to correct the inaccurate impression defendant portrayed by asking only about aspects of the telephone call favorable to the defense — Cook's memory of events that contradicted complainant's testimony — while leaving out unfavorable information from the same conversation, including Cook's opinion that defendant may actually have been capable of committing the assault. The State cites several of our cases for the proposition that a defendant "should not benefit from a selective presentation of the facts on cross-examination." *Recor*, 150 Vt. at 45, 549 A.2d at 1386; see also *Malshuk*, 2004 VT 54, ¶ 14; *State v. Crannell*, 170 Vt. 387, 406, 750 A.2d 1002, 1017-18 (2000), *overruled on other grounds by State v. Brillon*, 2008 VT 35, 183 Vt. 475, 955 A.2d 1108. The common thread in each of these cases is that one of the parties deliberately elicited testimony presenting a misleading picture of the facts. The court then allowed the opposing party to elicit other inadmissible evidence, such as the defendant's prior bad acts, but only for the limited purpose of rebutting the inaccurate portrayal. See, e.g., *Malshuk*, 2004 VT 54, ¶ 13 (holding that questions regarding witness's prior verbal outburst at defendant opened door for State to inquire about defendant's prior history of assaults against witness on basis that "[c]ross-examining an alleged victim as to why they don't like a person or has ill will toward a person opens the door for an explanation of why" (quotation omitted)); *Crannell*, 170 Vt. at 404-05, 750 A.2d at 1016-17 (holding that the court properly allowed witness to disclose that defendant had admitted to car bombing only after defendant tried to show it was unreasonable for witness to fear defendant); *Recor*, 150 Vt. at 45, 549 A.2d at 1386 (holding that testimony regarding defendant's past abuse of witness was admissible because "[o]nce the issue of *why* the complaining witness disliked the defendant was raised on cross-examination, it was proper for the State to present a complete picture for the jury.").

¶ 16. ■ There are two significant differences between the cases cited by the State and the facts of this case. First, defendant's questions here did not present a misleading depiction of the facts. See *Percy*, 146 Vt. at 482, 507 A.2d at 959 (stating the open-door doctrine should be used only to remove "unfair prejudice" from original evidence). Defendant questioned Poljacik about how the incident had affected their friendship, and Poljacik explained that

he was angry at Cook during the conversation, but that they eventually were able to resume being friends. Defendant then asked the specific question of whether Cook had told Poljacik that complainant had entered his room on the night of the incident. This question was intended to thwart the State's attempt to portray Cook as lacking any memory of the incident, and to impeach complainant's version of events, which included a visit to the friend's room. Though these facts were favorable to the defense's case, they were not misleading — they merely conveyed Poljacik's view of the state of their friendship and Cook's perspective on the events that happened that night, which clashed with complainant's version.

¶ 17. ■ ■ Second, even if defendant painted a misleading picture of events, the admission of Poljacik's statements did not serve to rebut defendant's portrayal. "Since the purpose of the [open-door] rule is to allow the other party to explain or meet the evidence which was improperly admitted, it should be applied only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *Id.* at 482, 507 A.2d at 959 (quotation omitted). Here, the State's question went far beyond the limited issues probed by the defendant on cross-examination regarding Poljacik's conversation with Cook — the state of their friendship and one specific detail about the friend's memory of the night of the incident — to ask about the friend's view of the ultimate issue: defendant's guilt. Cook's speculative opinion regarding the ultimate issue in the case, defendant's guilt, was inapposite to the specific issues raised on cross-examination. Contrary to the State's contention, the mere fact that the inadmissible hearsay statements were made during the same conversation as the statements elicited on cross-examination does not, without more, serve to cure their inadmissibility. *Martinez*, 988 F.2d at 702 (explaining that open-door doctrine does not "justify receipt of rebuttal evidence merely because it is in the same category of excludable evidence as the evidence previously offered"); see also *Batchelor*, 135 Vt. at 369, 376 A.2d at 740 (holding that it was error for court to admit evidence of defendant's prior offenses to show reason for witness's bias against defendant, because evidence merely showed defendant's tendency to commit similar offenses and did not actually rebut defendant's allegation of bias). Since defendant's questions did not mislead, and the State did not attempt to rebut defend-

ant's questions, there was no open door for the testimony elicited by the State on redirect, and its admission was error.[2]

¶ 18. ■ Since it was error for the court to admit the testimony, we must determine whether the error requires reversal of defendant's conviction. The State argues for review under a plain error standard because, although defendant objected at trial, he did not request a limiting instruction. Contrary to the State's argument, such an exacting request is not required. Rather, defendant's "timely, specific objections when the issues were raised" were sufficient to preserve the objections for appeal. *State v. Fisher*, 167 Vt. 36, 43, 702 A.2d 41, 46 (1997) (holding that objection was not preserved where defendant failed to object at time issue was raised and then only objected generally to line of questioning without naming specific grounds); see V.R.E. 103(a)(1). Because defendant contemporaneously objected to the trial court's admission of the evidence, we will review for harmless error. V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

¶ 19. ■ An error is harmless if, without considering the offending evidence, there is still "overwhelming evidence to support the conviction" and "the evidence in question did not in any way contribute to the conviction." *State v. Shores*, 143 Vt. 224, 228, 465 A.2d 269, 271 (1983); see also *State v. Williams*, 2010 VT 83, ¶ 35, 188 Vt. 413, 8 A.3d 1053 ("Error is harmless if we can say beyond a reasonable doubt that the jury would have convicted absent the error."). In making this determination, "[t]he two most important factors employed in our inquiry are (1) 'the strength of the prosecution's case without the offending evidence'; and (2) 'the

---

[2] Although not necessary to reach this conclusion, we have doubts as to whether the substance of Cook's statements that he thought defendant could have committed the assault would have been admissible even if they had not been hearsay but rather testified to at trial by the declarant. First, the testimony speaks to defendant's character, and is not admissible as proof that defendant acted in conformity with that trait on a particular occasion. V.R.E. 404(a)(1). Second, Cook's statement as to whether he thought defendant could have done it was speculative and not based on any personal knowledge Cook possessed as to defendant's actions on the night of the incident. See V.R.E. 602 (requiring lay-witness testimony to be supported by evidence showing "personal knowledge of the matter"). Finally, even if relevant, the statement was highly prejudicial, as it went to the ultimate issue to be determined by the jury — defendant's guilt. Given that the statement's probative value was tenuous at best, it would likely not survive the Rule 403 balancing test for admission.

strength of the offending evidence.'" *Williams*, 2010 VT 83, ¶ 35 (quoting *State v. Lipka*, 174 Vt. 377, 385, 817 A.2d 27, 34 (2002)). Other factors we consider are "'the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial.'" *Id.* (quoting *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6).

¶ 20. ■ Based on these factors, we conclude that the error was not harmless. Witness statements played a substantial role in supporting the jury verdict, making witness credibility of paramount importance. We addressed the importance of witness credibility in *Lipka*. We held in that case that admission of evidence regarding prior sexual assaults to show that defendant's contact with the complainant was not accidental was erroneous. *Lipka*, 174 Vt. at 397, 817 A.2d at 44. The error was not harmless because there was no physical evidence connecting the defendant to the assault, and the outcome depended in substantial part on the jury's determinations as to witness credibility. *Id.* at 384-89, 817 A.2d at 34-37. Given these circumstances, the erroneous testimony with the potential to make one side more believable than the other was not harmless given defendant's "'presumption of innocence [and] the State's high burden of proof.'" *Id.* at 387, 817 A.2d at 36 (quoting *State v. Lynds*, 158 Vt. 37, 43, 605 A.2d 501, 503 (1991)).

¶ 21. Although other witnesses testified as to events immediately before and after the incident, only defendant and complainant testified as to what happened during the alleged sexual encounter. See *State v. Brillon*, 2010 VT 25, ¶ 21, 187 Vt. 444, 995 A.2d 557 (holding that erroneous admission of evidence was not harmless because "[a]lthough other witnesses testified to events that occurred before and after the actual altercation, only defendant and [the complainant] testified as to what occurred [during the incident]"). Without more, this evidence is not strong enough to conclude that the jury would have convicted beyond a reasonable doubt without the erroneously admitted hearsay evidence. See *Lipka*, 174 Vt. at 387, 817 A.2d at 36 ("Given that the only direct evidence of the sexual abuse came from [the complainant], we do not believe that the alignment of the supporting witnesses can be determinative under the high standard for harmless error.").

¶ 22. The strength of the offending evidence also weighs against a finding of harmless error. Cook's hearsay statements have little

probative strength because his speculative belief that the defendant could possibly commit the assault is not determinative of whether defendant actually committed the assault. Reporter's Notes, V.R.E. 401 (evidence has probative value if it has "any tendency to establish (or refute) the proposition"). On the other hand, the testimony was highly prejudicial. The evidence was inculpatory because it went directly to the ultimate issue of defendant's guilt — it was not peripheral, but rather went to the very heart of the State's case. Moreover, the offending testimony was prominently featured in the trial, as the jury heard that Cook — defendant's friend — thought that defendant could have committed the assault before Cook even testified. Poljacik was asked to restate Cook's statements a second time following defendant's objection, further reinforcing the point to the jury. Finally, the evidence was not cumulative or duplicative because the content was not repeated or echoed by any other testimony or evidence at trial. Cf. *State v. Burgess*, 2007 VT 18, ¶ 9, 181 Vt. 336, 917 A.2d 528 (holding erroneous evidence was harmless because it was "merely cumulative" having been repeated by other witnesses during trial).

¶ 23. Finally, the fact that the trial nearly resulted in a hung jury, with the court prompting the jurors to continue deliberating before reaching a verdict, suggests the error may have impacted the jury verdict. Given how close the verdict was, we cannot conclude beyond a reasonable doubt that the same verdict would have been reached if the erroneous evidence had been excluded. See *State v. Winter*, 162 Vt. 388, 401, 648 A.2d 624, 632 (1994) ("In view of the jury's split verdict, we cannot say [the error] was harmless."); *State v. Giroux*, 151 Vt. 361, 365, 561 A.2d 403, 406 (1989) ("The error here cannot be deemed harmless. The jury deliberated nearly seven hours in this case where the evidence of guilt was not overwhelming.").

¶ 24. Because this error alone requires reversal and remand for a new trial, we do not reach defendant's other arguments. Although we do not decide the case on these grounds, however, we would be remiss not to mention the offensive language — namely, the use of the term "slut" — used by the State during closing argument. We should not need to remind the state's attorney's office that this word has no place in the Vermont courts. Moreover, the argument underlying the State's use of the term was misleading and inaccurate. From our reading of the

transcript, defendant did not improperly malign complainant's character: the *State* did, by drawing sexist inferences — that, if the encounter was consensual and motivated by complainant's fight with her boyfriend, then she *must* be a "slut" — from defendant's version of the facts. It has long been improper for defendants on sexual assault charges to characterize complaining witnesses in these terms. The State was on abundant notice that its argument was equally improper.

*Reversed and remanded for a new trial.*

