NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 75

No. 24-AP-142

| | |
|---|---|
| Susan Inouye | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Estate of Patricia McHugo et al. | October Term, 2024 |

H. Dickson Corbett, J.

Kevin M. Henry and Angélina L. Debeaupuis of Primmer Piper Eggleston & Cramer, PC, Burlington, for Plaintiff-Appellant.

Justin B. Barnard and Noah A. Greenstein of Dinse P.C., Burlington, for Defendant-Appellee Estate of Patricia Bixby McHugo.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, for Defendants-Appellees Gregory McHugo and Nancy McHugo.

PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.  **REIBER, C.J.**   Plaintiff, Susan McHugo Inouye, appeals the trial court's order dismissing her claims against defendants, Gregory McHugo, Nancy McHugo, and the estate of Patricia Bixby McHugo.  Susan sought damages and equitable remedies based on allegations that Patricia breached a contract for mutual wills made with Susan's father, John McHugo, under which Susan was a beneficiary.  The trial court concluded that because Patricia provided notice of her intent to revoke her will during John's life and John had an opportunity to change his own will in response, there was no detrimental reliance and therefore no enforceable contract.  Alternatively,

the court concluded that John consented to rescission of the mutual-wills contract. We conclude that unilateral notice of intent to revoke did not render the contract unenforceable and that there was insufficient evidence of consent to rescind the contract. Accordingly, we reverse and remand to the trial court for further proceedings.

## I. Background

¶ 2.     The following background comes from the trial court's findings of fact and the appellate record. John McHugo and Patricia Bixby McHugo were married and had three children, Gregory, Nancy, and Susan. Though John and Patricia divorced in 1978, they remained close, and John titled most of his real property and bank accounts in his and Patricia's names as joint tenants with rights of survivorship. In 1997, John and Patricia enacted mutual wills while living in Arizona. The wills provided that the residue of each party's estate would be placed in trust for the benefit of the other during their lifetime and would then be divided equally among the three children. The wills stated that they were "executed in consideration of a mutual will simultaneously executed" by the other party and that "the parties have agreed not to revoke or alter these Wills except with the mutual consent of both."

¶ 3.     In 2006, after having a falling out with Susan, Patricia executed a new will that provided for Gregory and Nancy, but disinherited Susan. The court found that John was made aware of Patricia's intentions on at least two occasions. First, Gregory discussed the situation with John in 2006, and John acknowledged Patricia's intentions. Second, Susan discussed the situation with John in 2007, and he again expressed awareness and apologized. Despite his awareness of Patricia's intentions, John took no steps to change his own estate plan. John passed away in 2010 and his property passed to Patricia through right of survivorship. Patricia passed away in 2016 in Vermont and her 2006 will was probated.

¶ 4.     Susan initially attempted to contest the 2006 will in probate court, but the court concluded that the 2006 will had validly revoked the 1997 will. On appeal, this Court affirmed,

2

concluding that "[e]ven assuming that testator executed an enforceable contract for mutual wills in 1997, this would have no impact on the <u>allowance</u> of the 2006 will." <u>In re Est. of McHugo</u>, 2020 VT 59, ¶ 10, 212 Vt. 519, 237 A.3d 1239. We noted, however, that Susan was "not left without a potential remedy" and could bring a breach-of-contract claim to enforce the 1997 mutual-wills contract. <u>Id.</u> ¶¶ 1, 13. Susan then brought the current action in the civil division, alleging breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with an expected inheritance, and unjust enrichment, and seeking to recover a one-third inheritance of her parents' property.

¶ 5. Following a merits hearing, the civil division issued a written order dismissing all of Susan's claims. First, the court concluded that the contract was unenforceable because there was no showing of detrimental reliance by John. In the court's view, "[i]t is only when one of the testators dies without any notice of the other's intention to change their will that an enforceable detrimental reliance attaches." The court stated that because John received notice of Patricia's intention to change her will prior to his death and had "both the opportunity to amend his own estate plan in response and the capacity to do so," there was no detrimental reliance and the mutual-wills contract "did not become enforceable." The court rejected Susan's argument that mutual consent was required under the express terms of the contract because "the argument does not align with the equitable principles of detrimental reliance and estoppel that justify enforcement of mutual wills." The court noted that John would have had no ability to enforce the contract during his life because he still had the opportunity to amend his estate plan and could not otherwise show detrimental reliance on Patricia's promise. The court also suggested that a rule of notice, rather than consent, was preferable from an evidentiary standpoint because evidence of consent would likely involve inadmissible hearsay. Second, as an alternative to its primary holding, the court concluded that even if the standard did require a finding of mutual consent, such consent was

3

present here given that John had notice of Patricia's plan to create a new will and acquiesced to it through his inaction. The court dismissed all of Susan's claims, and she appealed to this Court.

## II. Choice of Law

¶ 6. Both parties agreed in their briefing and at oral argument that because the 1997 mutual wills were enacted in Arizona, the law of that state governs this appeal. Under our case law, however, choice-of-law issues in contract cases are evaluated under the "analysis set forth in the Restatement (Second) of Conflict of Laws." In re Ambassador Ins. Co., 2022 VT 11, ¶ 15, 216 Vt. 255, 275 A.3d 122; see also Pioneer Credit Corp. v. Caren, 127 Vt. 229, 233, 245 A.2d 891, 894 (1968) (first adopting Second Restatement approach in contract cases). Under this approach, we look to "several factors to determine which state has the most significant relationship to the . . . contract," Ambassador Ins. Co., 2022 VT 11, ¶ 15, including the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the "domicil" of the parties.[1] Restatement (Second) of Conflict of Laws § 188 (1971). However, "[b]efore analyzing the issue under the factors set forth in the Restatement, we must first consider whether" the foreign state's law "actually conflicts with Vermont law." Ambassador Ins. Co., 2022 VT 11, ¶ 16. "The proponent of foreign law . . . bears the burden of demonstrating that foreign law conflicts with Vermont law." Id. ¶ 17; see also V.R.C.P. 44.1(a) (requiring party to give notice of foreign law it intends to raise).

---

[1] Susan cites to our decision in Maghu v. Singh, where we noted that "[u]nder the doctrine of lex loci, a contract's validity, extension, performance, or release should be determined by the law of the jurisdiction in which the contract was entered." 2018 VT 2, ¶ 31, 206 Vt. 413, 181 A.3d 518. However, the quoted language was not a statement of the test we apply to choice-of-law issues; rather, it was merely a recitation of the doctrine of lex loci, as part of a rejection of the argument that the doctrine would prevent this Court from entertaining a divorce action where the marriage contract was signed in a country with different divorce laws. See id. ¶ 32 ("[L]ex loci has no application with respect to the jurisdiction of a court to entertain a divorce action."); see also Amiot v. Ames, 166 Vt. 288, 291-92, 693 A.2d 675, 677 (1997) (noting lex loci doctrine was recommended under First Restatement but displaced by Second Restatement, and overruling prior cases that applied lex loci in tort disputes).

¶ 7.    Neither party has met the initial burden of proving any conflict with Arizona law. To the contrary, the parties suggest that this is a novel question of both Vermont and Arizona law. At oral argument, defendants implied that such a conflict may exist given that Arizona has a statute that governs the validity of mutual wills and Vermont does not. See A.R.S. § 14-2514. But while Vermont has no governing statute, this Court has recognized the validity of various contracts for testamentary transfers and has declined to "carve out an exception for promises made in the form of a mutual will." Est. of McHugo, 2020 VT 59, ¶ 12. The parties do not suggest that the wills contract did not comply with the Arizona statute, or that any case law in either Vermont or Arizona is dispositive on this issue. Because neither party has carried the burden of showing that Arizona law conflicts with Vermont law, we will apply Vermont law to analyze the mutual-wills contract. See Ambassador Ins. Co., 2022 VT 11, ¶ 18 (concluding that Vermont law applies where "no [foreign state] appellate court has squarely addressed this question"); Lowery v. Lowery, 156 Vt. 268, 273 n.3, 591 A.2d 81, 84 n.3 (1991) (applying Vermont law "because neither party has argued or demonstrated here, or in the trial court, that there is any relevant difference between the laws of [the foreign state] and Vermont"); see also Pioneer Credit Corp., 127 Vt. at 234, 245 A.2d at 894 ("The assumption, that the [foreign law] is like our own, is justified so long as it is reasonable and does not impose oppressive consequences.").

¶ 8.    We note that the trial court order did not explicitly decide which state's law applies to the parties' contract. In fact, the court did not cite a single case from either Vermont or Arizona in analyzing the legal questions on appeal. Because there was no identified conflict with Arizona law, we apply Vermont law as the default here on appeal. However, during further proceedings on remand, conflicts may become evident. If so, the parties may raise arguments to the lower court as to which state's law should apply.

### III.  Discussion

¶ 9.     On appeal, Susan's primary contention is that the court erred in requiring only notice to rescind the contract, rather than mutual consent.  Assuming that consent was required, Susan also challenges the court's conclusion that John consented to revocation of the contract.  In the alternative, Susan argues that even if notice suffices, the court's finding of notice was insufficiently supported by the record.

¶ 10.    We review a trial court's factual findings with deference and will uphold them "unless they are clearly erroneous."  Constr. Drilling, Inc. v. Eng'rs Constr., Inc., 2020 VT 38, ¶ 12, 212 Vt. 323, 236 A.3d 193.  We will uphold the trial court's resulting legal conclusions if "reasonably supported by the findings."  Unifund CCR Partners v. Zimmer, 2016 VT 33, ¶ 10, 201 Vt. 474, 144 A.3d 1045.  However, "[w]e review pure questions of law de novo."  In re Est. of Kurrelmeyer, 2010 VT 20, ¶ 10, 187 Vt. 620, 992 A.2d 316 (mem.).

### A.  Enforceability of Contracts for Mutual Wills

¶ 11.    Susan argues that the enforceability of a contract for mutual wills "is rooted in the contract itself and not detrimental reliance and estoppel."  She contends that the agreement is supported by adequate consideration in the form of mutual promises not to revoke the wills and is therefore a valid contract.  In Susan's view, while Patricia remained free to revoke her will at any time, doing so did not relieve her of her obligations under the contract.  She also argues that the trial court's evidentiary considerations are both incorrect and irrelevant to the determination of whether consent was required to revoke the contract.

¶ 12.    We agree with Susan that the contract was enforceable on its own terms and that unilateral notice was insufficient to rescind the contract.  Based on the trial court's findings, John and Patricia enacted a valid contract for mutual wills.  As we held when this dispute first came before us, "Vermont law has recognized and enforced contracts to make a devise" and "there is no reason to carve out an exception for promises made in the form of a mutual will."  Est. of McHugo,

6

2020 VT 59, ¶ 12. We will therefore treat a contract to make a will in the same way as any other contract. See Minderman v. Perry, 437 P.2d 407, 409 (Ariz. 1968) ("A contract to make a will is controlled by the same rules and principles as other contracts."). As with any other contract, this requires showing "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Sutton v. Vt. Reg'l Ctr., 2019 VT 71A, ¶ 60, 212 Vt. 612, 238 A.3d 608 (quotation omitted). There is no dispute whether the parties manifested mutual assent through their reciprocal wills, which were simultaneously executed and included a statement that "the parties have agreed not to revoke or alter these Wills except with the mutual consent of both."

¶ 13. Defendants instead argue that "while both testators are alive . . . there is no consideration supporting the promises, because neither party has yet 'performed' and suffered a detriment by disposing of their property under the terms of the mutual will." But as we have recognized, "[m]utual promises, in each of which the promisor undertakes some act or forbearance that will be, or apparently may be, detrimental to the promisor or beneficial to the promisee, and neither of which is void, are sufficient consideration for one another." H.P. Hood & Sons v. Heins, 124 Vt. 331, 337, 205 A.2d 561, 565 (1964) (quotation omitted); see also K-Line Builders, Inc. v. First Fed. Savs. & Loan Ass'n, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983) ("A promise for a promise is adequate consideration."). By agreeing not to change their wills, Patricia and John made a promise not to exercise a legal right; this is itself valid consideration. See 3 Williston on Contracts § 7:48 (4th ed. 2024) ("A forbearance to exercise a legal right is valuable consideration to support a contract."). Accordingly, we will follow the vast majority of other jurisdictions and recognize that the promises entailed in a contract for mutual wills constitute valid consideration. See, e.g., Curry v. Cotton, 191 N.E. 307, 311 (Ill. 1934) ("The mutual promises of the husband and wife are sufficient consideration to support the agreement to make a joint will with reciprocal provisions."); Est. of Wade v. Detar, 449 P.2d 488, 493 (Kan. 1969) ("The minds of the parties met [and] their mutual promises were sufficient consideration to support the agreement."); Shimp

7

v. Shimp, 412 A.2d 1228, 1235 (Md. 1980) ("[V]aluable consideration is shown where each testator agrees by joint will or other contract to make a particular testamentary disposition in return for a like promise."); Concordia Coll. Corp. v. Salvation Army, 470 N.W.2d 542, 547 (Minn. Ct. App. 1991) ("[M]utual promises not to change their wills were sufficient consideration."); Arrington v. Westport Bank, 577 S.W.2d 166, 172 (Mo. Ct. App. 1979) ("Consideration for such an agreement may be found in the materiality of promises of the parties with respect to gifts to preferred beneficiaries of each."); Powell v. Am. Charter Fed. Savs. & Loan Ass'n, 514 N.W.2d 326, 333 (Neb. 1994) ("The consideration supporting the contract is the agreement of each to devise his or her respective estates according to the terms of the will."); Shea v. Begley, 766 P.2d 418, 420 (Or. Ct. App. 1988) ("Mutual promises not to alter, amend or revoke a joint will can support a binding and enforceable contract."); Kerper v. Kerper, 780 P.2d 923, 932 (Wyo. 1989) ("Valuable consideration in this context may consist of a spousal exchange of mutual promises, which promises impose a legal liability upon each promisor.").

¶ 14.    Having concluded that a valid contract existed here, we next consider whether unilateral notice of revocation was sufficient to rescind the contract. We recognize that this question has divided courts and commentators. See, e.g., W. Anderson, Annotation, Joint, Mutual, and Reciprocal Wills, 169 A.L.R. 9, IV(c)(4) (1947) ("There are conflicting views in reference to the right of a testator to revoke notwithstanding the contract, during the lifetime of the other party but without his consent."); 79 G. Blum et. al, Am. Jur. 2d Wills § 674 (2d ed. 2024) ("The courts are not in agreement whether a testator may revoke a contractual will notwithstanding the contract, during the lifetime of the other party but without his or her consent."). However, we are of the opinion that under fundamental contract-law principles, where mutual consent to revoke is required in the contract, unilateral notice of revocation is not sufficient to deprive the other party of their bargained-for benefit.

¶ 15.    Because the parties had a valid contract which provided for consent in order to rescind, the contract could not be avoided simply by providing notice of intent to breach.  As one court put it:

> If the mutual agreement itself, followed by execution of the wills, is a consideration sufficient to satisfy the law, it should be irrevocable without reference to any notice that may be given by the party that wishes to revoke.  The consideration, if sufficient, would continue to be so, and should be just as effective a bar to revocation after notice as before.  So it must be apparent that the courts, in holding that a mutual or joint will may be revoked upon giving notice, in effect hold that the mutuality of the agreement, carried out by executing the will, is not in and of itself a sufficient consideration to support the compact.

Canada v. Ihmsen, 240 P. 927, 931 (Wyo. 1925).  Given our conclusion that the parties' mutual promises were adequate consideration here, we cannot hold consistent with contract law that notice would be sufficient for revocation.  See Shimp, 412 A.2d at 1231 (" 'A valid contract is never revocable except by the consent of all parties to it.' " (quoting B. Sparks, Contracts to Make Wills 115 (1956)).  Several courts have reached the same conclusion.  See, e.g., Thompson v. Boyd, 32 Cal. Rptr. 513, 522 (Cal. Dist. Ct. App. 1963) ("While a joint and mutual will may be unilaterally revoked, a contract remains alive until it has been terminated, either according to its own stipulations for termination or through the acts of the parties evidencing a cancellation, rescission, or abandonment." (citation omitted)); Curry, 191 N.E. at 310 ("The great weight of authority is that, where the joint will is made as the fruition of a contract between the testators, it may not be revoked by either testator, with or without notice, without the consent of the other testator."); Pederson v. First Nat'l Bank, 143 N.W.2d 425, 428 (Wis. 1966) ("A contract to make a will or to enter into a mutually satisfactory disposition remains in effect until the contract is discharged by performance or until it is abandoned by mutual consent or rescinded by agreement."); see also Williams v. Chastain, 350 P.2d 430 (Or. 1960) (" '[T]he overwhelming weight of authority reaches

9

the logical, and what seems to be the inevitable, conclusion that the contract is irrevocable except by mutual consent of both parties to it.' " (quoting Sparks, supra, at 110)).

¶ 16. The requirement of mutual consent to rescind the contract is reinforced here given that the contract, by its express terms, states that "the parties have agreed not to revoke or alter these Wills except with the mutual consent of both." As we have consistently said, we will enforce a contract "as written and not . . . rewrite it on behalf of one . . . of the parties." DeBartolo v. Underwriters at Lloyd's of London, 2007 VT 31, ¶ 9, 181 Vt. 609, 925 A.2d 1018 (mem.) (alteration in original) (quotation omitted); see also SKI, Ltd. v. Mountainside Props., Inc., 2015 VT 33, ¶ 26, 198 Vt. 384, 114 A.3d 1169 ("We will not rewrite the contract, nor graft conditions onto an unambiguous contractual provision merely because the passage of time and the course of development have led the parties to positions they had not anticipated."). As the New York Court of Appeals has recognized, "[a]n agreement to make mutual wills revocable only by consent is not the same as an agreement to make mutual wills revocable on notice." Lally v. Cronen, 159 N.E. 723, 725 (N.Y. 1928). Given that the parties explicitly bargained to make the agreement irrevocable except by mutual consent, as opposed to mere notice, we must "take the intention of [the parties] from the language [they] used" and not impose a bargain that the parties did not make. Id.

¶ 17. We are unpersuaded by the logic of those courts that have decided this question the opposite way. For example, in Duhme v. Duhme, the Iowa Supreme Court concluded that "no binding contract exists so long as both parties live" and therefore "either party may revoke during the lifetime of both provided notice be given the other party of such intention." 260 N.W.2d 415, 419 (Iowa 1977) (quotation omitted). Similarly, in Allen v. Dillard, the Washington Supreme Court concluded that where parties have executed mutual wills with "no present consideration passing, and no testator having subsequently altered his position, to his detriment, relying upon

10

the understanding," the agreement "should be revocable during the lifetime of the parties, upon adequate notice of the revocation." 129 P.2d 813, 821 (Wash. 1942).

¶ 18. The conclusion in each case—implicit in Duhme and explicit in Allen—was that there was no present consideration and therefore no valid contract. But this conclusion cannot be squared with contract law. By foregoing a legal right to change their wills, parties to a mutual-wills contract exchange mutual promises that constitute valid, present consideration. The courts reached a contrary conclusion only by eliding the distinction between wills and contracts. See Shimp, 412 A.2d at 1231 (describing " 'confusion . . . among the commentators and in judicial dicta' " that results from " 'an evident failure to distinguish the effect of a will from the rights and duties created by contract' " (quoting Sparks, supra, at 110-11)). The Iowa Supreme Court noted that "a will, mutual or otherwise, becomes effective only upon the date of the testator's death" and therefore "the rights of parties under the will do not vest until the date of the death of the testator." Duhme, 260 N.W.2d at 418. But the relevant question here is not the effective date of the will, but the effective date of the contract. The contract, unlike the will, becomes effective at the time the agreement is made. Similarly, in articulating the policy reason for its decision, the Washington Supreme Court emphasized that "[t]he loss of his bargain by one party is not considered as undesirable as the loss of his power to make a will by the other." Allen, 129 P.2d at 821. But recognizing the validity of a mutual-wills contract in no way defeats the power of either party to make a new will; it merely recognizes that revoking a will after making a contractual promise not to do so may justify a breach-of-contract action. See Est. of McHugo, 2020 VT 59, ¶¶ 1, 9 (recognizing wills are "ambulatory and revocable" but "contract for mutual wills may be enforced through a breach-of-contract claim" (quotation omitted)). Treating a mutual-wills contract as unenforceable absent detrimental reliance would require treating the agreement as quasi-contractual—that is, as not being a valid contract. Given that all of the requirements for a valid contract are met here, we reject this approach.

11

¶ 19. We are similarly unpersuaded by the argument made by the trial court—and reiterated by defendants on appeal—that notice is sufficient for revocation since John would have been unable to enforce the contract during his lifetime. Even assuming that John would have had no remedy for anticipatory repudiation during his lifetime, that would not render the contract unenforceable. Indeed, it is black-letter contract law that the anticipatory breach of a contract by one party provides the non-breaching party with a choice of responses, including the option "to await the time for performance of the contract and bring suit after that time has arrived." 23 Williston on Contracts, supra, § 63:33. The alleged lack of an immediate remedy is thus not fatal to the enforcement of the contract.

¶ 20. Finally, the court's concerns about evidentiary problems do not overcome the fundamental principles of contract law at issue here. While hearsay issues may arise in trying to prove consent to rescind a mutual-wills contract, this is simply a fact of any dispute regarding statements by deceased individuals, and the same would be true even if notice were the only requirement. Furthermore, consent can be proven through various other means beyond hearsay statements, including a written statement of consent or evidence of actions inconsistent with the continuation of the contract. With a clear requirement of mutual consent now laid out, future parties can take preemptive steps to avoid such issues. Indeed, as Susan points out, John and Patricia did exactly that in a different context by obtaining written consent for a cash transfer from a joint account. Regardless, even acknowledging such evidentiary issues, the basic rules of contracts still govern. We therefore conclude that the court erred in requiring only a showing of notice to rescind the mutual-wills contract.

## B. Mutual Consent

¶ 21. Because we conclude that mutual consent was required here, we must next consider whether the trial court's determination that John consented to revocation of the contract was adequately supported by the record. The court's conclusion rests on two findings. First, the court

found that John had notice of Patricia's plan to create a new will in 2006 based on evidence of conversations that Gregory and Susan had with John in 2006 and 2007. Second, the court found that John made no attempt to change his own estate plan, despite having both the opportunity and the capacity to do so. The court found that in response to a conversation with Susan about Patricia changing her will, he "did not express surprise," "did not say that the disinheritance would be ineffective," "did not say that Patricia was prohibited by contract from doing any such thing," and "did not say that he would speak to Patricia and sort it out." Given the opportunity to change his will, he made no amendments and did not add Susan's name to any of his accounts. From these findings, the court inferred that John consented to the revocation of the mutual-wills contract.

¶ 22.    The court's finding of mutual consent is essentially a finding that the parties agreed to rescind the contract. See Restatement (Second) of Contracts § 283(1) (1981) ("An agreement of rescission is an agreement under which each party agrees to discharge all of the other party's remaining duties of performance under an existing contract."); see also 29 Williston on Contracts, supra, § 73:15 (noting courts have used variety of terms, including abrogate, annul, and cancel, but all "mean to rescind the contract and thereby nullify its existence"). Such an agreement "need not be expressed in words," but can be shown through actions that "show an intent by both parties to abandon their contract." Restatement (Second) of Contracts § 283 cmt. a. However, "[m]ere failure to object to a repudiation . . . is not a manifestation of assent to an agreement of rescission." Id. Rather, "[i]n order for a rescission or abandonment of a contract to be implied from the conduct of the parties, their actions must be positive and unequivocal." 29 Williston on Contracts, supra, § 73:16.

¶ 23.    The court made no finding of any action by John that constituted more than a failure to object to the repudiation, let alone the "positive and unequivocal" type of conduct required to infer consent. Silence in the face of a unilateral statement of intent to breach a contract does not result in the rescission of that contract. As discussed previously, a party's anticipatory breach of

13

a contract permits the non-breaching party to choose among available options, including "await[ing] the time for performance of the contract and bring[ing] suit after that time has arrived."[2] 23 Williston on Contracts, supra, § 63:33. Thus, John's silence is not inconsistent with an intent to enforce the contract. See Vincent v. Palmer, 19 A.2d 183, 188 (Md. 1941) ("[C]onduct which is not necessarily inconsistent with the continuation of a contract will not be regarded as showing an implied agreement to discharge it, although such conduct might be consistent with an agreement to discharge it."). Indeed, John's lack of action could have been based upon his reliance on the language of the contract which required mutual consent to revoke. Absent any further proof of his intent, mere inaction is insufficient to conclude that John consented to rescission. The court's conclusion to this effect is therefore inadequately supported by its findings.

¶ 24. The estate argues that we can alternatively affirm on the ground that Susan failed to carry her burden of proving that John did not consent to rescission of the contract. The estate characterizes this as an element of Susan's breach-of-contract claim, arguing that "a plaintiff claiming breach bears the burden of proving the absence of consent." We disagree. Rescission of a contract through mutual consent is an "affirmative defense" that will be "waived unless pleaded." 17B F. Amendola, et. al, C.J.S. Contracts § 902 (2024). The burden of proof lies with the proponent of the defense, not with Susan as part of her prima facie case. See, e.g., Resnik v. Morganstern, 122 A. 910, 911 (Conn. 1923) ("Rescission is an affirmative defense, and the plaintiff is not bound to meet it in establishing his case."); Rase v. Se. Neb. Consol. Sch. Dist., 212 N.W.2d 629, 632 (Neb. 1973) ("Rescission of a contract is an affirmative defense which must be pleaded."); Falcione v. Cornell Sch. Dist., 557 A.2d 425, 428 (Pa. Super. Ct. 1989) ("[R]escission is an affirmative defense which must be raised by the defendant."). Accordingly, Susan was not required to put forth evidence of an absence of consent to sustain her claims.

---

[2] We make no decision here about the availability of other remedies in the context of mutual-wills contracts.

¶ 25. Finally, the estate argues that we should affirm the court's finding of consent on the alternative grounds that the trial court erroneously excluded evidence that would have directly proven consent.[3] At trial, the estate sought to introduce a portion of Gregory's deposition, in which he quoted a 2016 email to Susan, where he stated, "I was not a party to these discussions, but based on my conversations with Dad, I can confirm that he consented with Mom's wish to create a new will." The court admitted the statement solely for the purpose of showing that John had notice of Patricia's revocation, not that he consented. The estate argues that the court abused its discretion in excluding the statement as hearsay and that it should have been admitted pursuant to Vermont Rules of Evidence 801(d)(2), 803(3), or 804(b)(3). Alternatively, it argues that plaintiff's counsel opened the door to its admission by questioning Susan about the statement during direct examination.

¶ 26. The trial court has discretion in ruling on the admission or exclusion of evidence, and we "will not disturb a discretionary ruling unless it is shown that such discretion was abused or entirely withheld." Follo v. Florindo, 2009 VT 11, ¶ 19, 185 Vt. 390, 970 A.2d 1230 (quotation omitted). Under the harmless error rule, the abuse of discretion must result in prejudice to a party's substantial rights. Id.; see V.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

¶ 27. As an initial matter, the estate did not preserve its arguments under Rules 801(d)(2) or 804(b)(3). To preserve an issue for appeal, "a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001) (quotation omitted). "The very purpose of the preservation rule is to ensure that the original forum is given an opportunity to rule on an issue

---

[3] We note that while defendants did not bring a cross appeal, they were not required to do so given that they were "content with the final order below, leaving [them] nothing to appeal." Huddleston v. Univ. of Vt., 168 Vt. 249, 255, 719 A.2d 415, 419 (1998).

prior to our review." Id. at 343, 779 A.2d at 1270-71. The trial court had no such opportunity here. The estate raised several issues in arguing for admission of Gregory's statement, but it never referenced either Rules 801 or 804. Because these arguments were not raised below, we will not consider them for the first time on appeal.

¶ 28. Next, we conclude that Rule 803(3) does not apply to John's statement to Gregory. As the parties acknowledge, Gregory's statement contains at least two layers of hearsay— Gregory's email to Susan and John's statement to Gregory. The parties agree that the statement to Susan is covered by Rule 803(5), as a recorded recollection. The question is whether John's alleged statement to Gregory that he consented to revocation of the contract is admissible under Rule 803(3), which allows statements "of the declarant's then-existing state of mind, emotion, sensation, or physical condition." For a statement to fall within Rule 803(3), the proponent must show that "(1) the statement was contemporaneous with the mental state to be proved, (2) the declarant had no time to fabricate or misrepresent thoughts, and (3) the state of mind is relevant to an issue in the case." State v. Madigan, 2015 VT 59, ¶ 25, 199 Vt. 211, 122 A.3d 517 (quotation omitted). "The guarantee of reliability" for such statements "is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement." Id. ¶ 24 (quotation omitted). The problem here is that John's alleged statement that he previously consented is not a statement of his mental condition "at the time of the statement." Id. (quotation omitted). Rather, it is a statement of memory, referring to his previous conversations with Patricia. Because the statement was not made in "circumstances of spontaneity that supply the necessary element of trustworthiness," it does not fall within this hearsay exception. Id. (quotation omitted).

¶ 29. Nor does it fall within the further exception for statements of "memory or belief" relating to "the execution, revocation, identification, or terms of declarant's will." V.R.E. 803(3). As the express language of Rule 803(3) makes clear, statements falling under this exception must

16

relate to the terms or validity of the declarant's will. "This last requirement makes clear that it is not sufficient for admission under Rule 803(3) that a hearsay statement . . . has some tangential connection to a will." 30B C. Wright, et. al, Federal Practice & Procedure § 6836 (2024 ed.). The statement here had no impact on the execution, revocation, identification, or terms of John's will and therefore does not fall under this exception.

¶ 30. For the same reasons, we reject the estate's argument that a statement made by Patricia to her attorney regarding John's consent should have been admissible under Rule 803(3). While the alleged statement may have impacted the validity of Patricia's will, it had no impact on the terms or validity of John's will. See V.R.E. 803(3) (allowing statements of memory or belief that relate to the validity or terms of the "declarant's will"). As the trial court held, "[t]he operative fact is not whether Patricia believed she had consent, but whether John . . . consented." Because the alleged statement does not implicate the execution, revocation, identification, or terms of John's will, the Rule 803(3) wills exception does not apply.

¶ 31. Finally, we reject the estate's argument that Susan opened the door to introduction of Gregory's statement. Under the open-door doctrine, "a party's use of evidence to create an incomplete or misleading picture opens the door so that the opposing side may, in the court's discretion, use otherwise-inadmissible evidence to complete the picture with appropriate detail." State v. Groce, 2014 VT 122, ¶ 14, 198 Vt. 74, 111 A.3d 1273 (quotation omitted). This doctrine should only be applied "to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." Id. (quotation omitted). The trial court admitted the entire statement but limited its substantive use to proving that John received notice. Because the entire statement was admitted, there was no incomplete or misleading picture of the evidence and therefore no prejudice. Absent any showing of unfair prejudice, the open-door doctrine has no applicability.

## IV.  Conclusion

¶ 32.    For the reasons discussed above, we conclude that the court erred in dismissing Susan's claims.  Contracts for mutual wills are enforceable on their own terms, not solely based on detrimental reliance.  As such, unilateral notice of intent to revoke the will is insufficient to rescind a mutual-wills contract.  The court's alternative finding that John consented to rescission of the contract is insufficiently supported.  Absent proof of some affirmative conduct, John's mere failure to object to Patricia's breach did not constitute consent.  Accordingly, we reverse and remand to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

FOR THE COURT:

_____
Chief Justice

18