Filed 09/30/25

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street
Burlington VT 05402
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 25-CV-03194

| | |
|---|---|
| Encore Holdings, LLC,<br>        Plaintiff<br><br>        v.<br><br>Thomas R. Gadhue, South Lincoln, Inc.,<br>Thomas Ryan Gadhue, Colin McCarthy, and<br>Formula Fire, Inc.,<br>        Defendants | FINDINGS, CONCLUSIONS, AND<br>ORDER |

RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND OTHER PENDING MOTIONS

This action arises out of Plaintiff Encore Holdings, LLC's purchase of a company operated by the individual Defendants Thomas R. Gadhue, Thomas Ryan Gadhue, and Colin McCarthy. Plaintiff seeks a preliminary injunction to enforce various non-disclosure, non-solicitation, and non-competition agreements signed by Defendants in connection with the transaction and their subsequent employment with Plaintiff. On July 30, 2025, the Court granted an ex parte Temporary Restraining Order against Defendants Thomas Ryan Gadhue and Colin McCarthy. On August 11, 2025, the Court held an evidentiary hearing on Plaintiff's preliminary injunction motion and heard testimony from several witnesses and admitted several exhibits. In addition, the parties have stipulated that the Court may consider the affidavits filed by the parties. Plaintiff is represented by F. David Harlow, Esq., Defendants Thomas R. Gadhue and South Lincoln, Inc. are represented by Pietro J. Lynn, Esq., and Defendants Thomas Ryan Gadhue, Colin McCarthy, and Formula Fire, Inc. are represented by David M. Pocius, Esq. The parties submitted lengthy post-hearing briefing, including a sur-reply, and the Court took the matter under advisement on September 5, 2025.[1] For reasons discussed below, Plaintiff's motion for a preliminary injunction is GRANTED.

Findings of Fact

Based on the credible evidence presented, the Court finds the following facts to be established by a preponderance of the evidence for purposes of deciding the instant motion.

---

[1] Given that the briefing on the preliminary injunction motion was necessarily impacted by the timing of the hearing and the evidence presented, Defendants' Motion to File Surreply (Mot. #3) is GRANTED. *See* V.R.C.P. 7(b)(4).

Plaintiff Encore Holdings, LLC ("Encore") is a company specializing in fire protection services, including design, installation, maintenance, and repair of fire alarm systems, sprinkler systems, and fire suppression systems. Currently, Encore operates in Vermont, as well as across the northeast and states in the south, and has over 2000 employees. In 2023, Encore was interested in getting into the business of installing, servicing and inspecting sprinkler systems in Vermont. It entered into discussions to purchase the assets of Mountain Valley Sprinkler Systems, Inc. ("Mountain Valley" or "MVSS"), which was well known as one of the most successful businesses in that field in the state. Encore's goal and business model is to acquire a company like MVSS with a deep customer base and industry technical knowledge and expertise, and then develop and expand this business. Mountain Valley was owned by Defendant Thomas R. Gadhue ("Thomas"). The business was located at 474 Shunpike Road in Williston, Vermont. Defendant Thomas Ryan Gadhue "(Ryan")" is Thomas Gadhue's son and was employed by MVSS as a project manager and estimator. Ryan was born and raised in Vermont and is the primary breadwinner for his wife and young son. Over his 20 years working in the fire safety and suppression industry, Ryan has earned an excellent reputation and has successful connections with customers. Defendant Colin McCarthy ("Colin") was also employed by MVSS as a project manager and estimator. Like Ryan, Colin was also born and raised in Vermont and is the primary wage earner for his family. He has worked in the fire safety and suppression industry for almost 15 years and has also become well known and respected in the field.[2]

In January 2024, Encore entered into an agreement with Mountain Valley to acquire its assets for $6.9 million. Pl.'s Ex. 1. In addition to all the physical assets, Encore purchased MVSS's customer lists, relationships, goodwill, jobs currently booked in the pipeline, and potential customer bidding opportunities. Encore also took over Mountain Valley's email addresses. Encore hired 15 of Mountain Valley's employees, including Ryan and Colin, in roles similar to their jobs at MVSS. Thomas also joined Encore in a consulting and advisory capacity. In connection with the sale of Mountain Valley, Thomas signed a Non-Competition Agreement, in which he agreed that he would "not cause or permit his Affiliates or any member of his immediate family . . . to . . . become engaged in a business competitive with [Encore]" anywhere that Encore conducts business for the latter of (i) five years following the closing date or (ii) two years after Thomas was no longer employed by Encore. Pl.'s Ex. 2 § 2.1. Thomas's Non-Competition Agreement states that it is governed by the laws of Rhode Island, *id*. § 3.4, and that any disputes arising under the agreement "shall be submitted to binding arbitration," *id*. § 3.2.

Ryan and Colin also each signed a Non-Disclosure and Non-Solicitation Agreement ("NDA/NSA") in January 2024 when they joined Encore as employees, in which they agreed to the following:

> During my employment and for a two (2) year period following my separation from Company for any reason, I shall not, directly or indirectly, employ, solicit, encourage or facilitate any other person or entity to employ or solicit, any person who is currently employed by Company or in any manner seek to induce any such person to leave his or her employment with Company.

---

[2] Because of the similarities in Defendants' names, the Court adopts the parties' approach and refers to the individual Defendants by their first names.

During my employment and for a two (2) year period following my separation from Company for any reason, I will not, directly or indirectly, solicit, encourage or facilitate any customer or prospective customer of Company to purchase goods or services then sold by Company from another person or unaffiliated entity.

Pl.'s Exs. 3 & 4 ¶ 3. The NDA/NSAs do not specify the law that governs their interpretation. Ryan was paid a salary of around $120,000, plus a bonus of approximately $45,000, Colin earned a salary of around $90,000, plus a $30,000 bonus. In addition, both Defendants were eligible to participate in a Unit Option Agreement that was offered as a reward to key employees. Ryan and Colin had limited time to review the agreements before signing and were told it was a time-sensitive matter. The Unit Option Agreements include the following non-competition covenants:

During the term of your employment . . . and until the second anniversary of the date of termination of your employment . . . you hereby agree that you will not . . . directly or indirectly through another Person, own any interest in, manage, control, participate in (whether as an owner, operator, manager, consultant, investor, agent, representative or otherwise), consult with, render services for or otherwise engage in any business or entity that is involved, directly or indirectly, in the business of developing, designing, installing, selling, inspecting, testing, servicing, repairing, retrofitting and/or reporting on fire detection systems, fire suppression systems, fire protection systems, alarms, fire extinguishers, sprinklers and/or special hazard suppression systems anywhere in the United States, as conducted by the Partnership and its Subsidiaries immediately prior to the date of termination of your employment (or in the 12 months preceding such date) or as proposed to be conducted by the Partnership or its Subsidiaries as of the date of termination to the extent you are aware of such proposed activities (any such business, a "Competing Business").

Pl.'s Exs. 5 & 6 § 10(c). The Option Agreements state that the non-competition covenant "may be amended or waived only with the prior written consent of you and the Partnership." *Id*. § 13. They specify that Delaware law shall govern questions about the construction, validity, and interpretation thereof. *Id*. § 19. When Encore was bought by another company in March 2025, Ryan received around $136,000 for his options and Colin received about $124,000 for his options.

In January 2024, Ryan and Colin began working for Encore. Ryan's primary role was as a project manager and he had responsibility for bidding on potential projects; Colin's role was as a project manager and scheduler. Again, these were similar roles to those the two men performed at Mountain Valley, and took advantage of the customer relationships and goodwill they had built there. In their positions at Encore, both Ryan and Colin had access to Encore's proprietary and confidential information, such as strategies for bidding, profit margins, backlog lists and other databanks, and the strengths and weaknesses of its process. Over time, Defendants grew unhappy with their positions; they felt Encore was not performing in a professional manner or providing quality service to customers. In December 2024, they had discussions with Encore management about leaving the company and submitted resignation letters. However, eventually,

they were convinced to stay. Also in December 2024, Thomas decided to retire, but he stayed connected with Encore through consulting agreement.

In May 2025, Ryan and Colin resigned from Encore and formed the company Defendant Formula Fire Protection. Formula Fire operates in same fire safety and suppression business as Encore and as Mountain Valley prior to being acquired by Encore. Further, Formula Fire is located in the same building that Mountain Valley had occupied. Through Formula Fire, Ryan and Colin have bid or performed work on at least three different jobs that were initially submitted to Encore or that Encore was involved with to some degree when Defendants left the company. To begin, in June 2025, less than a month after leaving Encore, Ryan and Formula Fire received a permit from the State to install a sprinkler system at 17 Park Street in Essex Junction, which was being developed by Milot Real Estate, a former customer of Mountain Valley. Pl.'s Ex. 10. The permit was sent to Ryan's old MVSS email address, and received by Encore, which is how they learned about it. Pl.'s Ex. 11. Milot originally sent the plans to Mountain Valley in April 2024 (after the Encore acquisition), and the email was routed to Ryan at Encore. Pl.'s Ex. 12. However, Ryan did not enter the potential project into Encore's system. He indicated he did not see it at the time. On May 20, 2025, just days after Ryan and Colin resigned from Encore, Thomas forwarded the email and plans from his MVSS email to himself at another email outside the company. Pl.'s Ex. 13. Encore believes Thomas then sent the plans to his son, Ryan. But Ryan testified that he was contacted by Milot after he left Encore about the need to get drawings on an expedited basis. He stated he received the plans from the project architect and was able to submit the permit application immediately in order to get the permit issued in June.

The second project that began at Encore is Pittsford Valley Farm. In February 2025, while at Encore, Ryan submitted a bid for this project, developed by general contractor Naylor & Breen. On June 11, 2025, after he left Encore, Ryan submitted a bid for the same project and scope of work on behalf of Formula Fire. Naylor & Breen had questions about the bid and emailed another Encore project manager who previously worked for Mountain Valley about it, not seeming to realize that the quote had come from Ryan's new company. Pl.'s Ex. 14.

The third project is known as Sun and Ski East Inn and Suites. While at Encore, Ryan bid on this project, which was awarded to Encore. However, in June 2025, the contractor was having issues with Encore's price and schedule and reached out to Ryan. In their Affidavits, Ryan and Colin indicated they felt comfortable pursuing this and the other projects because the customers reached out to them, saying they were dissatisfied with Encore and did not want to use them.

On July 30, 2025, Encore filed its Complaint against Defendants asserting breach of contract, tortious interference, unfair competition, misappropriation of trade secrets, and other claims. Encore seeks a preliminary injunction against Defendants Ryan Gadhue, Colin McCarthy, and Formula Fire to prevent them from competing with Encore, soliciting Encore's current and prospective customers, and using Encore's confidential information while this action is pending.

4

<u>Discussion</u>

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 205 Vt. 586 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). In considering the request under Rule 65 of the Vermont Rules of Civil Procedure, "the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. (quotation omitted). The moving party has the burden of establishing the relevant factors, which include "(1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest." *Id*. (citing *In re J.G.*, 160 Vt. 250, 255 n.2, 627 A.2d 362, 365 n.2. (1993)). The balancing test articulated by the Vermont Supreme Court is designed to be "sufficiently flexible to allow for a preliminary injunction in cases in which the court cannot definitively conclude that the movant is likely to prevail on the merits, but the balance of other factors tips strongly in favor of an injunction." *Id*. at 255 n.3. The standard under Delaware law is much the same. *See Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *3 (Del. Ch. Oct. 6, 2022) ("To obtain a preliminary injunction, the movant must demonstrate: (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction." (citations omitted)). The Court considers each of the factors below.

I.     <u>Likelihood of Success</u>.

A party seeking a preliminary injunction is "not required to prove his case in full," and the court's findings of fact and conclusions of law "are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted); s*ee also Gardner v. Jefferys*, 2005 VT 56, ¶ 14, 178 Vt. 594 (trial court's interpretation of restrictive covenant following limited hearing on motion for temporary injunction does not bind court's later interpretation when record is fully developed).

Defendants argue that Plaintiff is unlikely to succeed on the merits of its claims because the restrictive covenants here are overbroad, unreasonable, and impermissible. Accordingly, the Court must initially determine whether the restrictive covenants of the NDA/NSAs and the Option Agreements are enforceable.[3] "The modern approach to reviewing restrictive covenants

---

[3] In its reply brief to Thomas's opposition to the preliminary injunction motion, Encore makes clear that it is not seeking a preliminary injunction against Thomas, but rather seeks to enforce the terms of Thomas's Non-Competition Agreement against Ryan, Colin, and Formula Fire. *See* Reply to Thomas's Opp. at 1-2. Defendants argue argued that Thomas's non-competition agreement is unenforceable against them. *See* Defs.' Opp. at 8-9. Given the Court's conclusions that the non-competition provisions in Ryan and Colin's Option Agreements are enforceable and, like Thomas's non-compete, restrict Defendants from engaging in a competing business, the Court need not reach this question at this time. However, the Court notes it has serious questions about whether Ryan and Colin can be bound by the terms of Thomas's non-compete, given their lack of privity to the contract. *See, e.g.*, *Korda v. Chicago Ins. Co.*, 2006 VT 81, ¶ 25, 180 Vt. 173 (noting that generally, a contract may only be enforced against a party to the contract);

5

is one of reasonableness. Courts seek to balance the employer's interest in protecting its business and investments, the employee's interest in pursuing a desired occupation, and the public's interest in the free flow of commerce." *Summits 7, Inc. v. Kelly*, 2005 VT 97, ¶ 7, 178 Vt. 396. Under Vermont law, "a restrictive covenant 'is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.'" *Systems & Software, Inc. v. Barnes*, 2005 VT 95, ¶ 4, 178 Vt. 389 (quoting *Restatement (Second) of Contracts* § 188(1) (1981)).[4] Courts "proceed with caution" when a party seeks to enforce a restrictive covenant "because such restraints run counter to public policy favoring the right of individuals to engage in the commercial activity of their choice." *Id*. (citing *Roy's Orthopedic, Inc. v. Lavigne*, 142 Vt. 347, 350, 454 A.2d 1242, 1244 (1982)). Agreements containing restrictive covenants are nonetheless enforced "unless the agreement is found to be contrary to public policy, unnecessary for protection of the employer, or unnecessarily restrictive of the rights of the employee, with due regard being given to the subject matter of the contract and the circumstances and conditions under which it is to be performed." *Id*. (quoting *Vt. Elec. Supply Co. v. Andrus*, 132 Vt. 195, 198, 315 A.2d 456, 458 (1974)). "[C]ontinued employment alone is sufficient consideration to support a [restrictive covenant] entered into during an at-will employment relationship." *Summits 7*, 2005 VT 97, ¶ 18. Vermont courts have found restrictive covenants of five years to be reasonable. *Andrus*, 132 Vt. at 199. The employee bears the burden of showing why a restrictive covenant should not be enforced. *Id*. at 198 (citation omitted).

The law in Delaware is similar: "Delaware courts . . . evaluate noncompetition and nonsolicitation contracts holistically, carefully, and nonmechanically, with an eye towards reasonableness, equity, and the advancement of legitimate business interests." *Kodiak Bldg. Partners*, 2022 WL 5240507, at *6. They "carefully review noncompete and nonsolicit provisions to ensure that they (1) are reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *Id*. at *4 (quotation omitted). In balancing the equities, Delaware courts take into account the consideration an employee receives in exchange for the restriction. *See Kan-Di-Ki, LLC v. Suer*, No. 7937-VCP, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015). Nonsolicitation and noncompete covenants that are entered into as part of the purchase of a business "are subject to a less searching inquiry" than if the covenants are part of an employment contract. *Kodiak Bldg. Partners*, 2022 WL 5240507, at *4 (quotation omitted). Delaware courts have found restrictive covenants of two years to be reasonable in duration. *See Tristate Courier*

---

*Berlin Dev. Corp. v. Vt. Structural Steel Corp.*, 127 Vt. 367, 371, 250 A.2d 189, 192 (1968) (defendant not responsible for damage to owner's tenants where contract for new roof was between defendant and owner).

[4] The NDA/NSAs do not have a choice-of-law provision. The Court determines that Vermont law governs the interpretation of these agreements because, although Encore is not domiciled in Vermont, the agreements were entered into in Vermont and the events at issue took place in Vermont. *See Inouye v. Estate of McHugo*, 2024 VT 75, ¶ 6, 328 A.3d 1229 (courts apply law of state with "most significant relationship to contract," considering "place of contracting," "place of performance," and location of contract's subject matter, among other factors (quotation omitted; citing *Restatement (Second) of Conflict of Laws* § 188 (1971))).

*& Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004); *Singh v. Batta Envtl. Assocs., Inc.*, No. Civ.A 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003).

Like Vermont, Delaware courts enforce non-compete agreements to the extent necessary "to protect the legitimate economic interests of the employer." *Kodiak Bldg. Partners*, 2022 WL 5240507, at *8. Legitimate interests include protecting the employer's goodwill and confidential information from misuse. When a business is acquired, these interests also extend to the assets and information that were purchased, which include employees that are retained by the purchasing entity. *Id.* at *8-9. (citations omitted). As the *Kodiak* court observed:

> [A] buyer has a legitimate business interest in asking the target's employees to stand down from competing in the relevant industry because the buyer has just paid handsomely for the business and the broad non-compete clears the seller from the competitive space while the buyer strives to make the business he just bought successful. The reality is that it is the employer's goodwill in a particular market which is entitled to protection. Restrictive covenants in connection with the sale of a business legitimately protect . . . the purchased asset's goodwill and competitive space that its employees developed or maintained.

*Id.* at *10 (quotations omitted). Delaware "[c]ourts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *Research & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992). The Court will analyze the relevant agreements executed between Encore and Ryan and Colin in turn.

### A.  NDA/NSA Agreements

Ryan and Colin do not dispute that they are engaged in a competing business with Encore in the fire safety and sprinkler system field, and they concede that some of their customers or contacts were formerly customers of Encore or its target, Mountain Valley. However, they assert that the NDA/NSAs are "unreasonable and thus unenforceable" because they prohibit solicitation of any customer or prospective customer with respect to purchasing goods or services sold by Encore. They further complain that the NDA/NSAs contain no geographic limitation on this prohibition against non-solicitation. *See* Defs.' Opp. at 11.

The NDA/NSAs limit "the solicit[ation], encourage[ment] or facilitat[ion of] any customer or prospective customer of [Encore] to purchase goods or services then sold by [Encore] from another person or unaffiliated entity." Exs. 3 & 4 ¶ 3. Here, the evidence establishes that Ryan and Colin are operating their new fire safety business out of the very location that Mountain Valley occupied when Encore acquired it. Thus, at this stage, the Court need not reach the question of whether the NDA/NSA Agreements can be enforced without any geographic limitation. *See Summits 7*, 2005 VT 97, ¶ 23 (holding that "it may not be necessary for a court to determine the exact limiting boundary of a restriction so long as the employer can show that the employee breached a reasonable restriction"). Indeed, Ryan and Colin do not

7

contend that enforcing the NDA/NSAs in Williston or in the northern part of Vermont is unreasonable. For purposes of the preliminary injunction, the Court concludes that, pursuant to a reasonable interpretation of the Agreements' language, Ryan and Colin are precluded from soliciting business from a customer or prospective customer in the markets where Encore operates. This protects Encore's legitimate economic interest in developing its new business and strengthening its customer relationships as it expected to do after acquiring Mountain Valley.

Further, Ryan and Colin do not dispute that the jobs known as 17 Park Street, Pittsford Village Farm, and the Sun and Ski Project were initially jobs that Encore was bidding on or was involved with to some degree when they left the company. They assert, however, that they did not "solicit" work on any of these three projects. Defs.' Opp. at 14, 18. The Court is unpersuaded. When Ryan and Colin took steps to bid on or work with the managers of these projects after leaving Encore, regardless of how they were contacted, they acted in violation of the NDA/NSAs' prohibition against "directly or indirectly, solicit[ing], *encourag[ing]* or *facilitat[ing]* any customer or prospective customer of Company to purchase goods or services then sold by Company from another person or unaffiliated entity." Exs. 3, 4 at ¶ 3 (emphasis added).[5] The restriction on pursuing Encore's customers and known potential customers is also reasonable and necessary to protect Encore's legitimate interests and investment in a developing business.

### B.    Option Agreements

Many of the same facts discussed above also establish that Ryan and Colin are in violation of the non-compete provisions of the Option Agreements. Defendants contend they were pressured into signing the Option Agreements, but their testimony did not demonstrate anything approaching undue duress and the emails Encore submitted as exhibits to John Mastropiero's Affidavit suggest otherwise. *See* Mastropiero Aff., Exs. 15, 16. Defendants also contend that Jon Driscoll, the Regional Director of Contracting for Encore, told them that if they remained with Encore and were still unhappy in April 2025, they could leave Encore "and do whatever [they] wanted." Gadhue Aff. ¶ 40; McCarthy Aff. ¶ 44. For his part, Driscoll contends this did not happen and denies that any Encore manager ever told Ryan or Colin that they could violate their non-solicitation and non-competition agreements if they terminated their employment with Encore. Driscoll Aff. ¶ 16. In any event, the Court cannot find that such a vague statement is sufficient to waive Encore's right to enforce the restrictive covenants. As

---

[5] Defendants' reliance on *St. Pierre v. McAllister*, Docket No. 2-1-21 Frcv, 2021 WL 4303963 (Vt. Super. Ct. Jan. 26, 2021), is misplaced. In that case, the non-compete agreement at issue was between the plaintiffs and the defendant, but the plaintiffs sold their business to a third party before the defendant began to compete with the business that was sold. Moreover, the third party did not retain the defendant as an employee when they acquired the business. *Id*. at *1, 3. Unlike this case, the trial court concluded that the acquiring company had no standing to enforce the defendant's non-compete agreement. *Id*. at *6. Further, in finding that the balance tipped in the employee defendant's favor, the court emphasized that plaintiffs no longer had a business to protect, defendant relied on his job working for a competing company as the "sole means of support for himself and his family," and the public had "a significant interest in having free and open competition in the fuel oil business, especially during the winter." *Id*. at *5-6.

noted above, the Option Agreements' non-competition provisions can only be amended or waived with Encore's written consent.  Exs. 5, 6 § 13.  No such evidence has been presented.

The non-competition provision applies to conduct "anywhere in the United States, as conducted by the Partnership and its Subsidiaries immediately prior to the date of termination of your employment (or in the 12 months preceding such date) or as proposed to be conducted by the Partnership or its Subsidiaries as of the date of termination to the extent you are aware of such proposed activities."  Exs. 5 & 6 § 10(c).  Both Encore and Defendants acknowledge that this language refers to the places where Encore conducts business or where the employee knows Encore is planning to conduct business.  Pl.'s Mot. at 10; Defs.' Opp. at 15 n.5.  This geographic scope is reasonable under Delaware law.  *See Lyons Ins. Agency, Inc. v. Wilson*, No. 2017-0092-SG, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018) ("[N]on-compete agreements that prohibit conduct that is in competition with the employer's business or that prohibit soliciting the employer's clients inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete." (quotation omitted)); *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) ("The overarching intent of a non-compete covenant is to protect the geographical area where the business owner conducts business, and to protect its economic interests against those who may have gained an unfair competitive advantage against them as a former employee." (citation omitted)).

When it purchased Mountain Valley, Encore was new to the Vermont fire sprinkler systems and fire suppressant market.  It paid $6.9 million for all of Mountain Valley's assets, which included its goodwill and confidential customer information.  When Encore was purchased by another company in 2025, Ryan was paid $136,094 for his options and Colin was paid $124,415 for his options.  Defendants maintain that they have always worked in the fire protection industry and that, as the main providers for their families, they would suffer "a very real, imminent hardship" if they are required to comply with the restrictive covenants.  Defs.' Opp. at 12.  The Court acknowledges that Defendants and their families may face some hardship if they are unable to work in the fire safety and suppression services industry for a period of time.  However, the restrictive covenants were clearly set forth in the NDA/NSAs and Option Agreements, and Defendants chose to sign these agreements, knowing the consequences if they decided to terminate their employments.  Thus, they were "not placed in the double bind of being both fired and subject to [two] years of employment restraint." *Andrus*, 132 Vt. at 199 (upholding five-year covenant not to compete when employee voluntarily terminated employment "for the very purpose of going into business competitively in the same special field"); *see also Summits 7*, 2005 VT 97, ¶ 18 (holding that employee's noncompetition agreement "is enforceable under its terms because [employee] voluntarily left her position with [employer] and shortly thereafter accepted a job with a nearby direct competitor").

In fact, Ryan and Colin did not have to remain with Encore after it acquired Mountain Valley; they were free to leave and start their own competing company right away without violating any of Encore's rights.  Nor did they have to agree to the Option Agreements when they were offered.  Defendants have not presented evidence that there are an insufficient number of businesses that provide the services that Encore and Formula Fire both provide or that the public

will suffer if Defendants are not permitted to compete with Encore.[6]  *Cf. FP UC Holdings, LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *11 (Del. Ch. Mar. 27, 2020) (noting that public policy of Alabama would be offended if non-compete agreement was enforced to shut down urgent care facility).  Finally, Defendants' complaints about how Encore was running its business or interacting with customers/prospective customers are not relevant to the question of whether the non-solicitation and non-compete agreements are enforceable.  On balance, the Court finds the equities favor Encore and the enforcement of the restrictive covenants.

Defendants also argue that Encore is a much larger company and provides many more services than they offer at Formula Fire and that, as a result, Formula Fire's sales and services of sprinkler systems have little impact on Encore's national business.  Defs.' Opp. at 15.  Even if this is true, it does not alter the fact that Ryan's and Colin's operation of Formula Fire in Vermont, indeed, in the same location as Mountain Valley, violates the clear terms of their agreements.  When it acquired Mountain Valley, Encore purchased its goodwill and customer relationships, including customers/potential customers looking for sprinkler systems.  It is reasonable for Encore to seek to restrict Ryan and Colin from engaging in a competing business that would undermine Encore's efforts to establish itself in the area, at least for some length of time. *Cf. Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 330 (E.D.N.Y. 2020) ("Where there is a sale of a business, involving as it does the transfer of its good will as a going concern, the courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale.  This rule is grounded, most reasonably, on the premise that a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value." (quotation omitted)).

In sum, based on the evidence in the record, the Court concludes that Defendants have failed to carry their burden to show why the restrictive covenants should not be enforced.  Thus, the Court concludes that Encore is likely to prevail on its claim that Ryan and Colin are in breach of both the NDA/NSAs and the non-compete provisions of the Option Agreements.

## II.    Irreparable Harm.

To establish irreparable harm, a plaintiff "must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotation omitted).  Further, a plaintiff must show that the harm is "actual and imminent, not remote or speculative." *Id*.  When "it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief" the request for a preliminary injunction will ordinarily be denied. *Taylor*, 2017 VT 92, ¶ 40 (citing C. Wright & A. Miller, *Fed. Prac. & Proc.* § 2948.1 (3d ed. 2017)).  In determining whether adequate monetary compensation exists, the court must look at the specific harm in the case.

---

[6] For example, during the August 11 hearing, Ryan mentioned two companies other than Encore and Formula Fire that were being invited to bid on the Pittsford Village Farm project, *see* Tr. at 100 (attached as Exhibit to Reply), so it appears the public has choices when selecting a company to provide sprinkler systems other than Encore and Formula Fire.

As our Supreme Court has long held, the "potential loss of a business satisfies the irreparable harm requirement for the issuance of an injunction, and demonstrates the inadequacy of a remedy at law." *Campbell Inns, Inc. v. Banholzer, Turnure & Co.*, 148 Vt. 1, 7, 527 A.2d 1142, 1146 (1987) (citing *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984)). Additionally, irreparable harm is typically found to be established in situations involving a business's loss of clients, their referrals, and harm to a business's reputation. "Irreparable injury may be shown through . . . [the] loss of revenues from . . . clients, and loss of referral business usually garnered from clients. Loss of goodwill associated with a business, which is difficult to quantify, can constitute irreparable injury, even if monetary damages, as well as injunctive relief, are requested." *Battenkill Veterinary Equine P.C. v. Cangelosi*, 768 N.Y.S.2d 504, 507 (App. Div. 2003) (citations omitted); *see also Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp.*, 889 N.Y.S.2d 793, 802 (App. Div. 2009) ("Harm to business reputation is harm for which money damages are insufficient and for which injunctive relief may be appropriate.").

Vermont courts have found irreparable harm where an employee developed close relationships with an "employer's customers or knowledge of an employer's business" and could "use those acquaintances or knowledge in a competing business." *Barnes*, 2005 VT 95, ¶ 12 (citing *Dyar Sales & Mach. Co. v. Bleiler*, 106 Vt. 425, 175 A. 27 (1934)). "Because it is very difficult to calculate monetary damages in the event of the loss of a client relationship 'that would produce an indeterminate amount of business in years to come,' the violation of an enforceable non-compete constitutes irreparable harm." *Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 400 (W.D.N.Y. 2014) (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)).

Here, Encore has established that it faces actual and imminent harm from Defendants' violations of their restrictive covenants that cannot be remedied by money damages alone. Competition from Formula Fire poses a threat to Encore's investment in the market and the business it is trying to build through its acquisition of Mountain Valley. It has real potential to interfere with Encore's new customer relationships and cause the loss of potential clients that is very difficult to quantify. *See, e.g.*, *Intertek Testing Servs.*, 443 F. Supp. 3d at 329 ("Generally, when a party violates a reasonable non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction." (quotation omitted)); *Andrus*, 132 Vt. at 199 (holding that where an employee "voluntarily left his employer for the very purpose of going into business competitively in the same special field," the "potential for harm to the [employer's] business was certainly established, and "injunctive relief is adequately supported"). Therefore, the Court concludes that Encore has met the threshold for demonstrating irreparable harm if the preliminary injunction is not granted.

III.    Balancing of Harms.

As discussed above, the Court finds that in the absence of a preliminary injunction, Encore stands to lose more than Defendants. Defendants' competing business threatens to destroy the customer relationships Encore purchased and sought to develop in the Mountain Valley transaction. Encore paid $6.9 million for Mountain Valley's assets, which included

Mountain Valley's goodwill, its customers, customer lists, customer relationships, bids, ongoing jobs, and prospective jobs. Ryan and Colin were key employees at Mountain Valley, and they had relationships with customers that Encore expected to grow and develop as it gained a foothold in the Vermont market. Allowing Defendants to compete with Encore and take advantage of the relationships they developed over a number of years as the face of Mountain Valley would be unfair to Encore and could cause lasting harm to Encore that may extend longer than the terms of the restrictive covenants. *See Barnes*, 2005 VT 95, ¶ 6 (noting that "the loss of even a single contract could deprive plaintiff of revenue for many years"). On the other hand, while Defendants and their families may face some hardship if they are unable to work in their chosen industry for some time, little evidence was presented that they would be unable to find *any* type of comparable employment. Moreover, Ryan and Colin may reenter the market, if they so choose, at the expiration of their restrictive covenants. Alternatively, Defendants are free to relocate to a geographic location where Encore does not operate if they want to continue working in the sprinkler system industry during the term of their restrictive covenants. Thus, the Court finds that, without the preliminary injunction, Encore would suffer greater harm than Ryan and Colin.

IV.     Public Interest.

Finally, the Court cannot find that this is a case where the public interest weighs against enforcing the restrictive covenants. Vermont's economic marketplace is strengthened where businesses can rely on the enforceability of their contracts and know that employees hired from an acquired business will not be permitted to leave and take the business's customers with them in violation of non-solicitation and/or non-competition agreements. Moreover, no evidence has been introduced suggesting that there is a dearth of companies offering sprinkler systems in Vermont such that the public would be harmed by enforcing the restrictive covenants at issue.

Order

For the foregoing reasons, Encore's Motion for a Preliminary Injunction (Mot. #1) is GRANTED. The Temporary Restraining Order currently in effect against Ryan Gadhue, Colin McCarthy, and Formula Fire, Inc. will continue in force as a preliminary injunction until further order of the Court.

Encore's Motion to Waive Posting of Security (Mot. #2) is GRANTED.[7]

Defendants' Motion to Clarify Temporary Restraining Order (Mot. #4) is DENIED as moot.

---

[7] In both the NDA/NSA and Option Agreements, Defendants agreed to waive the posting of a bond if Encore was forced to take legal action to enforce the agreements. Pl.'s Exs. 3 & 4 ¶ 4; Pl.'s Exs. 5 & 6 § 10(f). The Court finds this constitutes good cause, *see* V.R.C.P. 65(c), and there has been no suggestion that Encore is without means to satisfy any damages that could be awarded under 12 V.S.A. § 4447. *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (holding trial court did not abuse its discretion in waiving bond requirement where "Defendants have not shown that they will likely suffer harm absent the posting of a bond").

Electronically signed on September 30, 2025 at 10:56 AM pursuant to V.R.E.F. 9(d).

_____
Megan J. Shafritz
Superior Court Judge